## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sheila M. Dunn, | Case No. 0:22-cv-00615-NEB-JFD |
| Plaintiff, | Judge Nancy E. Brasel |
| v. | Magistrate Judge John F. Docherty |
| Associates in Psychiatry and Psychology, P.A., et al., | **DECLARATION OF JAMES A. GODWIN IN SUPPORT OF MOTION TO AMEND COMPLAINT** |
| Defendants. | |

STATE OF OREGON    )
                     ) SS.

COUNTY OF JACKSON  )

James A. Godwin, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am a licensed attorney in good standing in the State of Minnesota and am duly admitted to practice before this Court.

2. I am employed as a partner at Godwin Dold. In that capacity, I am one of the attorneys for Plaintiff, Sheila M. Dunn.

3. Attached as **Exhibit A** are true and correct excerpts from the deposition of Seth Franz, the CEO of APP. Mr. Franz's deposition was taken on March 4, 2022 (before the removal of this action to this Court) as APP's corporate designee under Minn. R. Civ. P. 30.02(f).

4. Attached as **Exhibit B** is a true and correct copy of Ms. Dunn's proposed Second Amended Complaint.

5.  Attached as **Exhibit C** is a true and correct copy of Ms. Dunn's redlined proposed

Second Amended Complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct. Executed on July 30, 2022.

/s/ James A. Godwin
James A. Godwin

**EXHIBIT A**

STATE OF MINNESOTA          DISTRICT COURT - CIVIL DIVISION

COUNTY OF WINONA                THIRD JUDICIAL DISTRICT

---------------------------------------

Sheila M. Dunn,

           Plaintiff,

           vs

Associates in Psychiatry and
Psychology, PA; and Does 1-20,

           Defendants.

Hon. Nancy L. Buytendorp
File No. 85-CV-21-1472
Case Type:  Employment

Deposition of
  SETH FRANZ
 (Via Zoom)

---------------------------------------

      The Zoom discovery deposition of SETH FRANZ, taken

before Ken Dick, Court Reporter and Notary Public in and

for the County of Olmsted, State of Minnesota, on the 4th

of March, 2022, commencing at 9:05 a.m.


                APPEARANCES:

      MR. JAMES A. GODWIN, (Via Zoom), Attorney at Law,
of the law firm of Godwin Dold, 300 First Avenue
Northwest, Suite 306, Rochester, Minnesota  55901, for
the Plaintiff.

      MR. BENJAMIN R. KINNEY, (Via Zoom), Attorney at
Law, of the law firm of Gordon, Rees, Scully &
Mansukhani, LLP, 100 South Fifth Street, Suite 1900,
Minneapolis, Minnesota  55402, for the Defendant APP.

1                              SETH FRANZ

2          was first duly sworn via Zoom, testified as

3      follows:

4

5                          CROSS-EXAMINATION

6      BY MR. GODWIN:

7          Q.  Good morning.  Can you please say your name and

8      spell your last name for the record.

9          A.  Seth Franz.  F R A N Z.

10         Q.  Mr. Franz, my name is James Godwin.  I am an

11     attorney for Sheila Dunn in this matter.  I am going to

12     ask you, where are you located right now?

13         A.  In Chicago at the Gordon Rees law office.

14         Q.  Is anyone with you?

15         A.  Yes.

16         Q.  Is that APP's attorney, Benjamin Kinney?

17         A.  Yes.

18         Q.  Is anyone else with you?

19         A.  No.

20         Q.  Have you ever had your deposition taken before?

21         A.  Yes.

22         Q.  When was that?

23         A.  At various times.

24         Q.  Various times.  Okay.  Let's start with the first

25     one.  When was the first time you had your deposition

1    Q.  What information did she give you that you didn't

2    have before?

3         MR. KINNEY:  I am going to object to the extent it

4    calls for privileged information.

5         If there were conversations, Seth, that you had

6    outside of the conversations when we were present, you

7    can go ahead and answer.

8    A.  There were none.

9    Q.  (Mr. Godwin) What position does Ms. Heu have with

10   the company?

11   A.  She is a clinical manager.

12   Q.  Do you have any communications with her regarding

13   this case in writing?

14   A.  Only that that has been produced.

15   Q.  Have you communicated with anyone else regarding

16   this case?

17   A.  I let our HR director know that I would be out

18   today.

19   Q.  Who is your HR director?

20   A.  Julie Aubel.  A U B E L.

21   Q.  How long has Ms. Aubel been --

22   A.  And I let our chief clinical officer also know

23   that I would be out today.

24   Q.  Who is your chief clinical officer?

25   A.  Priyanka Rao.

1    Q.   How long has Ms. Aubel been the HR director?

2    A.   Since September of 2021.

3    Q.   Is she the HR director for APP?

4    A.   Yes.

5    Q.   Do her responsibilities cover any other companies?

6    A.   Yes.

7    Q.   What are those?

8    A.   Great Lakes Behavioral Partners.

9    Q.   Any others?

10   A.   Main Sail Therapeutics.

11   Q.   I believe the audio delays if we talk over each

12   other a little bit.  But I will try to slow down.  We

13   will bear with it.

14        Who was the HR director before her?

15   A.   I'm sorry, could you repeat the question.

16   Q.   Sure.  Who was the HR director at APP before

17   Ms. Aubel?

18   A.   I was working as the HR director while we were

19   looking for an HR director.

20   Q.   What was the time frame when you were serving in

21   that role as HR director?

22   A.   Since August of 2019 through September of 2021.

23   Q.   How long has Ms. Rao been with the company?

24   A.   Since November of 2020.

25   Q.   To be clear, when I refer to the company or

1   instructing him not to answer?

2       MR. KINNEY:  What was the question?

3       MR. GODWIN:  Are you instructing him not to

4   answer?

5       MR. KINNEY:  What was the question posed to the

6   witness?

7       MR. GODWIN:  Were there any other entities

8   involved in that lawsuit?

9       MR. KINNEY:  You can answer.

10   A.  No.

11   Q.  (Mr. Godwin) Thank you.

12       Are you employed now, Mr. Franz?

13   A.  Yes.

14   Q.  Where are you employed?

15   A.  Associates in Psychiatry and Psychology.

16   Q.  Anywhere else?

17   A.  Great Lakes Behavioral Partners.

18   Q.  Anywhere else?

19   A.  No.

20   Q.  With APP, what is your title?

21   A.  Chief Executive Officer.

22   Q.  Do you have any other titles at the moment?

23   A.  No.

24   Q.  I believe you indicated that you were serving as

25   the HR director at one point.  Are you serving in any

1   roles other than CEO right now?

2       A.  No.

3       Q.  Have you served in any other roles, other than

4   CEO, in the last three years, or HR director?

5       A.  Yes.

6       Q.  What roles were those?

7       A.  Various roles.  I filled in for any vacancies that

8   arose.

9       Q.  When did you come to work for APP?

10      A.  In August of 2019.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     A.  Yes.

2     Q.  Do you use that in conjunction with Microsoft

3  Word?

4     A.  For leadership, yes.

5     Q.  What's leadership?

6     A.  Leadership of the organization.

7     Q.  Oh.  I thought you said or leadership.  You said

8  for leadership.  Is that right?

9     A.  Correct.

10    Q.  Are there handbooks created with Microsoft Word?

11    A.  I believe so.

12    Q.  Who creates them?

13    A.  I've created them in the past, with the help of

14  our attorneys.  And now our HR director is overseeing

15  them.

16    Q.  When is the last time you created one?

17    A.  I would have to check the records.

18    Q.  Was it in 2022?

19    A.  No.

20    Q.  Was it in 2021?

21    A.  Yes.

22    Q.  The last time you created or modified an employee

23  handbook, did you use Microsoft Word for that?

24    A.  Yes.

25    Q.  Have you personally ever used any other Word

1       MR. GODWIN:  Under Rule 30, the only appropriate

2   instruction not to answer are to protect privilege or if

3   there is a court order.  I don't believe that's the case

4   here.  So I am going to ask you to withdraw the

5   instruction.  I will let you act as you desire.

6       MR. KINNEY:  I will not withdraw the instruction.

7   There is a pending motion for protective order on this

8   subject.

9   Q.  (Mr. Godwin) Let's look at page 19.  So, on page

10  19 there is a sub D here, it says Matters Requiring

11  Heightened Review.  Do you see that?

12  A.  Yeah.

13  Q.  Are you seeing my screen still?

14  A.  I am, yes.

15  Q.  Maybe it took a second to update.  Do you see it

16  now?

17  A.  Yes.

18  Q.  Okay.  So this policy refers to APP's chief

19  executive officer.  And that's you, correct?

20  A.  Yes.

21  Q.  And that was you for the entire course of

22  Ms. Dunn's employment; is that right?

23  A.  Yes.

24  Q.  And it also refers to APP's owner, correct?

25  A.  Yes.

1    Q.   Currently that is Ms. Rao; is that right?

2    A.   Yes.

3    Q.   Who was it before it was Ms. Rao?

4    A.   Steve Patton.

5    Q.   Was that prior to your involvement in the company?

6    A.   Yes.

7    Q.   The next page, which is page 20, there is a

8    subdivision E entitled Non-Retaliation.  Do you see that?

9    A.   Yes.

10   Q.   This refers to contacting the director of

11   operations.  Who is the current director of operations

12   for APP?

13   A.   We do not have a current director of operations.

14   Q.   At the time this handbook was provided to

15   employees, who was the director of operations?

16   A.   At the time it would have been me.

17   Q.   Let's look at the next page, number 21.  Rules of

18   Conduct.  And this refers to certain standards of job

19   performance and good conduct.  Can you tell me what those

20   standards are?

21   A.   I'm sorry, I don't understand the question.

22   Q.   So, the policy refers to certain standards of job

23   performance and good conduct.  Can you elaborate on that

24   at all?

25   A.   We have multiple positions.  I am not sure which

1   deposition, in the discovery that you all produced, it's

2   also come to our attention that she was calling patients

3   outside of our organization, on behalf of our

4   organization and not recording those documents.  And

5   still writing prescriptions on our system.

6      Q.   Is it Dr. Rao?  Should I be referring to her that

7   way?

8      A.   Yes.

9      Q.   Okay.  How did Dr. Rao communicate concerns that

10   providers brought to her attention to you?

11     A.   We had a weekly meeting.

12     Q.   Do you have an agenda for that meeting?

13     A.   Occasionally.

14     Q.   How was that agenda communicated?

15     A.   We typically have bullet points jotted down on

16   whatever scrap of paper we have available and we discuss.

17     Q.   Do you save those papers?

18     A.   No.

19     Q.   Do you ever have a follow-up email or other

20   documentation to record what you discussed and what the

21   results were?

22     A.   For certain things, yes.

23     Q.   How do you determine what warrants being recorded?

24     A.   It really depends on if there is another thought

25   that one of us has, or if we need to clarify something.

1    It's very discretionary.

2    Q.  Is that within your discretion, as to whether you

3    save something?

4    A.  It's in the discretion of Dr. Rao and myself.  If

5    one of us feels the need to follow up in writing, we do.

6    If we don't feel the need to follow up in writing, we

7    don't.

8    Q.  What would be something important enough for you

9    to follow up in writing?

10    A.  There are all kinds of different things; depending

11    on what action items there are.  If we need to -- I'm

12    sorry.  If it's something -- you know, it really depends

13    on if there is follow-up that's needed.  There doesn't

14    have to be -- there is not a certain threshold

15    necessarily, if there is something that's needs to be

16    followed up or a reminder.  There is not really a

17    criteria for how we follow up.

18    Q.  So if there is not a written follow-up, that's

19    because someone just made the determination that the

20    particular item wasn't important enough to have a written

21    follow-up; is that right?

22    A.  I think you are misinterpreting what I am saying.

23    Q.  I am trying not to.

24        What was the last thing that was important enough

25    to have a written follow-up?

1    A.  Early August of 2021.

2    Q.  Prior to her leaving, did you ask her to retain

3  any information she had about Ms. Dunn?

4    A.  No.

5    Q.  Why not?

6    A.  It was documented in our EMR system.

7    Q.  Did you ask her to confirm that everything she had

8  has been documented in the EMR system?

9    A.  No.

10   Q.  Why not?

11   A.  It didn't occur to me at that point.  This was

12  prior to Ms. Dunn's termination.

13   Q.  So Ms. Dunn's termination was in -- I will ask

14  you.  From your perspective, when was Ms. Dunn's

15  termination?

16   A.  The leadership team made that decision on June

17  21st in a meeting we had.  And I had a meeting scheduled

18  with Ms. Dunn for July 9th; which is where I terminated

19  her.

20   Q.  Where did that meeting on the 23rd take place?

21   A.  There was no meeting on the 23rd.

22   Q.  Sorry.  The June meeting, what date was that?

23   A.  The 21st.

24   Q.  My apologies.  Where did that meeting take place?

25   A.  Via Zoom.

1     Q.   Was everyone on Zoom?

2     A.   That's vague.  Can you please clarify.

3     Q.   Yeah.  Was there any participant who -- were there

4  any participants in that meeting who were physically

5  together at the time?

6     A.   No.

7     Q.   Did you take any notes regarding that meeting?

8     A.   Yes.

9     Q.   Were any of those regarding Ms. Dunn --

10    A.   I did not.  Dr. Rao did.

11    Q.   Has she provided those to you?

12    A.   She provided those as a recap; that we have since

13  produced to you.

14    Q.   Did she provide the other notes that she took?

15    A.   Which other notes?

16    Q.   Maybe I misheard you.  It sounded like you said

17  she took notes and then you created a recap.  Is that not

18  right?

19    A.   I don't know how she took notes.  She may have

20  typed them into an email.  She may have typed them into

21  Word.  I don't know how she takes her notes.  But she

22  sent a recap out after that meeting, which we have since

23  produced to you.

24    Q.   Did you ask her if she has any notes that we would

25  want produced in the lawsuit?

1   regarding Ms. Dunn; is that right?

2       A.   I said any communication or pertinent documents.

3       Q.   Okay.  How did you communicate that request to

4   them?

5       A.   I had a conversation with both, individually and

6   together.

7       Q.   In person?

8       A.   Remotely.

9       Q.   Did you document that communication in any way?

10      A.   No.

11      Q.   Did you do the confidentiality training?

12      A.   Yes.  I am our compliance officer.

13      Q.   When did you complete that?

14      A.   I'm sorry, could you repeat that.

15      Q.   Certainly.  When did you complete your training?

16           MR. KINNEY:  Objection.  This is irrelevant.

17   Totally beyond the scope.

18           Answer, if you know.

19      A.   I completed it -- the first time I completed it

20   was in 2014, and then annually after that.  My

21   compliance, I go through the training.  It's due for me

22   April 30th, I believe, for this year.

23      Q.   (Mr. Godwin) Maybe we are talking about different

24   type of training.  Are you saying that the first time

25   that APP providers were required to undertake this

1   training was in 2021?  Or are we talking about a

2   different kind of training?

3      A.   The specific reliance training that we have

4   required.  Prior to that we had quarterly HIPAA and OSHA

5   presentations that the providers were supposed to take.

6   That stopped in the second, third and fourth quarters of

7   2020 due to the pandemic.  That's why we rolled out the

8   new learning management system.

9      Q.   Was it Ms. Rao, if I remember correctly, who was

10  on maternity leave during part of this period?  Is that

11  right?  Or was that Ms. Hue?  I'm sorry.  Was it Dr. Rao?

12     A.   Yes.

13     Q.   Okay.  Thank you.  When did she go on maternity

14  leave?

15     A.   In March of 2021.

16     Q.   When did she come back?

17     A.   Mid June of 2021.

18     Q.   But she was still working?

19     A.   She was on leave.

20     Q.   Aren't there emails from her during that period?

21     A.   I am sure that there are emails from her during

22  that period.  She was the chief clinical officer.  She

23  checked in here and there.

24     Q.   Did you talk to her during that period?

25     A.   Yes.

1     Q.   Did you talk about Ms. Dunn with her during that

2  period?

3     A.   No.

4     Q.   Do you remember which day she returned from

5  maternity leave?

6     A.   It was mid June.

7     Q.   So before the meeting regarding Ms. Dunn's

8  employment on the 21st of June; is that right?

9     A.   Yes.

10    Q.   When you asked these two individuals to provide

11 pertinent communication, did you let them decide what

12 information was pertinent?

13    A.   I outlined what we were looking for, based on the

14 discovery request.

15    Q.   And you just did that orally?

16    A.   Yes.

17    Q.   So instead of providing them what the requests

18 actually were, you put them in your own words; is that

19 right?

20         A.   (Inaudible.)

21         MR. KINNEY:  Counsel, if we are between questions,

22 the witness would like to take a break.

23         MR. GODWIN:  There is one pending question.

24 That's whether he communicated the specific language of

25 the document request or whether he put them in his own

1    Q.   Is there one in Edina?

2    A.   There is not one in Edina, no.

3    Q.   Okay.  Are those all owned by APP, or Associates

4    in Psychiatry and Psychology, PA?

5    A.   Yes.  They are clinical assets.  Yes.

6    Q.   Is Dr. Rao the sole owner of APP, PA?

7    A.   I believe I have answered that.  But, yes, she is.

8    Q.   I wasn't trying to ask it repetitively.  It's hard

9    to remember everything.

10        So Ms. Rao owns APP, PA, which in terms owns these

11   offices; is that right?

12   A.   They practice at those offices.

13   Q.   Who owns the offices themselves?

14   A.   We lease in Faribault.  We lease everywhere.

15   Q.   So you are talking about the physical space,

16   right?

17   A.   If that's not what you are asking; I am not sure

18   what you are asking.

19   Q.   Sure.  What about the other physical assets?

20   Computers, for example, does APP own those at the other

21   locations?

22   A.   No.

23   Q.   Who does?

24        MR. KINNEY:  Objection.  Irrelevant.

25   A.   Great Lakes Behavioral Partners.

1   not asked directly to provide something and not provide

2   it to Ms. Dunn.

3      Q.  Who makes sure that APP complies with its human

4   resources legal obligations?

5      A.  Now it's our HR director.

6      Q.  You indicated earlier you understand that you are

7   here to testify on behalf of APP.  So my question is, if

8   you don't have this knowledge, who does?

9      A.  At that time we did not have an HR director.

10      Q.  So there is no way to know if Ms. Dunn requested

11   information she wasn't provided?

12      A.  She should have requested that from me.  That was

13   the proper protocol.  If she didn't request that from me,

14   as I said, I was the one calculating this.  I was the one

15   calculating all payroll.  Who else would she have gone

16   to?

17      Q.  How would she know to communicate directly with

18   the CEO regarding her wages?

19      A.  I communicated frequently with people about their

20   wages.

21      Q.  Is that in the employee handbook, that questions

22   about wages need to go to the CEO?

23      A.  I don't believe so.

24      Q.  Was it ever communicated to her in writing that

25   she needed to go to the CEO if she had a question about

1    her pay?

2       A.   It may have been communicated in writing at some

3    point.  To my knowledge it was not.  However, in all of

4    the meetings that we had where she was in attendance, I

5    addressed any payroll issues.  She knew, as did all of

6    our employees, that if they had a question regarding

7    payroll, they could come to me.

8       Q.   There was at least one time when you communicated

9    with Ms. Dunn regarding her wages but through an

10   intermediary, wasn't there?

11      A.   Laura Schroeder would answer questions

12   occasionally, yes.

13      Q.   Do you remember a time when Ms. Dunn indicated

14   that she thought that her pay was lower than it should

15   be?

16      A.   Yes.

17      Q.   When was that?

18      A.   I don't recall the exact date.

19      Q.   Do you remember if you communicated with Ms. Dunn

20   directly regarding that issue?

21      A.   I do not.

22      Q.   Did you tell her that she needs to be

23   communicating with you directly regarding that issue?

24      A.   I don't recall if I did or not.

25      Q.   So it is possible that employees think they should

1   be communicating with someone other than the CEO

2   regarding their wages; is that fair to say?

3       A.  If I was out and they had a question and they

4   needed an answer, Laura Schroeder would occasionally

5   answer those questions, yes.

6       Q.  Do you remember the nature of the error in

7   Ms. Dunn's pay?

8       A.  I do.

9       Q.  What happened?

10      A.  In transferring the number from the spreadsheet

11  into our payroll system, it was entered incorrectly.

12      Q.  She wasn't the only one that had that happen, was

13  she?

14      A.  Over time, no.

15      Q.  And she only received the payment she was entitled

16  to when she complained about it, right?

17      A.  I don't remember if she only received it because

18  of that.  We made a habit, and we still have that habit,

19  of going back through and auditing to make sure that we

20  are paying everybody accurately.

21      Q.  How many times have these errors happened?

22          MR. KINNEY:  Objection.  Irrelevant.  Beyond the

23  scope.  We are not here to talk about anybody else.  So I

24  will instruct the witness not to answer beyond with

25  regard to Ms. Dunn.

1          MR. GODWIN:  We are here to talk about the system

2    itself.  And we do plan to ask the court to ask about how

3    this error prone system is the one that was applied to

4    Ms. Dunn.  So I think we are entitled to ask about the

5    system itself.

6          MR. KINNEY:  All right.  Well, ask the court then.

7          MR. GODWIN:  What's the instruction?

8          MR. KINNEY:  The witness is only going to respond

9    with regard to issues with Ms. Dunn.

10     Q.  (Mr. Godwin) Okay.  Ms. Dunn was told, was she

11   not, that there was an error in someone else's wages as

12   well as hers?

13     A.  I don't recall.

14   ████ ██ ██ ██ ██ █ ████ ███ █ ████ ██ ████

15   ████ ███ ███ ██ ████

16   ████ ██ █ ████ ███ ████ ████ █ ████ █████

17   ██ ████ ███ ████ ██ ██ ████ ████ ██ ████

18   ██████ ███ ██ ██ ████ ████

19   ██ █████ ██████ ████ ███ ███ ████ █

20   Ms. Dunn's wages.  How did you come to realize that there

21   had been an error?

22     A.  I am not sure if she brought it up first or if we

23   caught it.  But it was a miss-key of a zero and a 6, I

24   believe.

25     Q.  Do you save those audits?

1  directly to me with payroll questions?

2  A.  My stance since then, and continues to be, if

3  somebody has a question around payroll, that they can

4  come to me.

5  Q.  They can, but they are not required to.  Is that

6  right?

7  A.  I am the one with the most information.  It makes

8  the most sense.  But they are not required to, no.

9  Q.  Did APP instruct Ms. Schroeder to preserve

10  documents that might be relevant to this dispute with

11  Ms. Dunn?

12  A.  No.

13  MR. GODWIN:  The next one is exhibit 8, which I

14  think is 6.  I am going to have to back out so we can see

15  it.  If you need me to zoom in to read the text, I can.

16  It's clear on my screen, but yours may be smaller.

17  Q.  (Mr. Godwin) So this appears also to be between

18  Ms. Schroeder and Ms. Dunn.  Is that your understanding?

19  A.  It's appears that way.

20  Q.  Okay.  And this refers to Ms. Dunn.  This one is

21  asking Laura, Ms. Schroeder, to tell her whether Seth

22  corrected the error with her check.  Do you see that?

23  A.  Yes.

24  Q.  Do you remember what that was?

25  A.  I do not remember what this was.

1    provider checks.  Do you see that?

2       A.   Yes.

3       Q.   Do you remember this error?

4       A.   We discussed it previously, yes.

5       Q.   This indicates that the error was around $6,000,

6    correct?

7       A.   Correct.

8       Q.   Do you know why she didn't say it was exactly

9    $6,000?

10      A.   I don't.  I don't know what her rationale for

11   saying that was.  She was not the one calculating payment

12   and entering it into our payroll system.  I was.

13      Q.   How did Laura come to know that Seth made an error

14   on a couple provider checks?

15      A.   We discussed that.

16      Q.   Did you send her an email?

17      A.   No.  Laura and I were constantly on the phone.

18      Q.   How much was the exact amount of the error?

19      A.   It was $6,000.  As I mentioned previously, I

20   miss-keyed a zero and a 6, I believe.

21      Q.   Okay.  So that's to the penny; is that right?

22      A.   What's to the penny?

23      Q.   The $6,000 miscalculation.

24      A.   Yes.

25      Q.   For what time range was that error?

1    A.  I believe this looks like in late November, early

2  December.

3    Q.  Do you know what the earliest date of services

4  that were affected by that error were?

5    A.  No.  There is a vast amount of services.  I have

6  not memorized every line item on these reports.

7    Q.  When should have that compensation been paid if

8  not for the error?

9    A.  It should have been paid with the paycheck that

10  was processed on this Friday, November 20th.  I think

11  it's 20th.  I can't tell.  It is too small.  That was a

12  pay period, it should have been processed then.  We

13  corrected it that day so that she would get paid on

14  Monday.  There was a one business day delay on that

15  compensation.

16    Q.  Were you one of the people acting in the interest

17  of APP in relation to Ms. Dunn?

18    A.  I'm sorry, could you repeat that.

19    Q.  Were you one of the people acting in the interest

20  of APP in relation to Ms. Dunn?

21    A.  I don't think I understand your question.

22    Q.  You are paying Ms. Dunn, right?

23    A.  Correct.

24    Q.  Calculating her wages.

25    A.  Yes.

1    Q.  And you are doing that in the interest of APP,

2  right?

3    A.  Yes.

4    Q.  So you are one of the people who acted in the

5  interest of APP with relation to Ms. Dunn; is that fair

6  to say?

7    A.  Yes.

8    Q.  Is Dr. Rao also someone who acted in the interest

9  of APP in relation to Ms. Dunn?

10    A.  I assume so, yes.

11    Q.  Okay.  Was there anyone else who acted in the

12  interest of APP in relation to Ms. Dunn?

13    MR. KINNEY:  Objection.  These are just vague and

14  confusing questions.

15    You can answer if you understand.  But I don't

16  even understand.

17    A.  Yeah.  I mean, I guess I don't understand 'in the

18  interest' here that you are asking.  I am very confused

19  over these questions.

20    Q.  (Mr. Godwin) Gotcha.  Let me ask it a little more

21  clearly.  The Wage Step Act says:  Employer means any

22  individual, partnership association, corporation,

23  business trust or any person or group of persons acting

24  directly or indirectly in the interest of an employer in

25  relation to an employee.

1     Q.   Okay.  Who told her?

2     A.   Who told her what?

3     Q.   That she was fired.

4     A.   I did.

5     Q.   Did you tell her why?

6     A.   Yes.

7     Q.   What did you tell her at that time?

8     A.   I told her that she was terminated for lack of

9     professionalism.  I can go into all those again if you

10    would like me to.

11         Laying on a bed during a company meeting.  Poor

12    patient boundaries.  Multiple times laying on a bed

13    during a company meeting.  Oftentimes underneath

14    blankets, as though she was resting or just woke up from

15    a nap.  The fact that those poor patient boundaries, she

16    was trying to provide therapy.  Which is not within her

17    scope.  She is a nurse practitioner.  Or an advanced

18    practice nurse.  She is not to provide only therapy

19    (sic).

20         The fact that we had to read all of her writings,

21    and it did not continue to improve.  We talked about the

22    liability she was to the company, because she continued

23    to write the wrong prescriptions.  She admitted that she

24    rushed through and she was trying to do better.  But

25    trying at that point was too late, when there were that

1   fired, does it?

2        A.   She wasn't fired at that time.   That's when we

3   made that decision.

4        Q.   Do you know why there is not an action on it?

5   Does someone have to tell Sheila that she has been fired?

6        A.   Because that was my action item to do.   It was

7   fully understood.

8        Q.   Why isn't Seth to contact her listed here?

9        A.   I don't how I can make that any clearer.   That was

10  my responsibility that I knew at that time.

11       Q.   So a few lines up in blue, there is an action item

12  that says Seth to contact.   Can you explain why that

13  action item is listed but terminating Sheila is not?

14       A.   This is our agenda, that we then sent out as a

15  recap.   Jessica Miller is one that multiple people

16  interviewed.   I could have reached out to her.   Other

17  people could have reached out to her.   It was determined

18  that I would.

19            In the others, there were multiple people that

20  could do it.   It was my decision.   It was my

21  responsibility to terminate Sheila.   We didn't need to

22  call that out explicitly.

23       Q.   Okay.   Let's look at the email addresses on here.

24  This has seth@ursabhm.com.   Do you see that?

25       A.   I do.

1                          CERTIFICATE

2

STATE OF MINNESOTA )
3                          )SS
COUNTY OF OLMSTED  )

4

        BE IT KNOWN that I took the Zoom discovery
5   deposition of the witness, SETH FRANZ; that I was then
    and there a court reporter and notary public in and for
6   said county and state; that said witness, before
    testifying, was duly sworn to testify to the truth, the
7   whole truth and nothing but the truth relative to the
    cause specified; that said deposition, upon
8   transcription, was made available to said witness for
    reading and signing; that the examination was conducted
9   on behalf of the parties as hereinbefore indicated; that
    the cost of the original has been charged to the party
10  who noticed the deposition; and that all parties who
    ordered copies have been charged at the same rate for
11  such copies; that I am not counsel of any party, a
    relative or employee of any counsel or party connected
12  with the action, nor financially interested in the
    action; and that the foregoing 215 pages contain to the
13  best of my ability, a true and correct transcription of
    all of the testimony of said witness and of all of the
14  proceedings had on the taking of said deposition.

15

16              WITNESS MY HAND AND SEAL this 21st day

17  of March, 2022.

18

19

20

21

22

23

24

25

Carney & Associates, Inc.
507-288-3558

**CARNEY & ASSOCIATES**
P.O. Box 262
Rochester, Minnesota 55903
507-288-3558

**WITNESS DECLARATION**

I hereby acknowledge that I have read the transcript of my deposition taken on March 4th, 2022, and that I have attached hereto any corrections, additions, or changes to my answers that I deem necessary.

Dated: _4/4/2022_

Deponent: _/s/ Seth Franz_
Seth Franz

| Page / Line | Correction / Change and Reason for Change |
|---|---|
| 17/15 | Change "Nathan Segal(ph)" to "Ethan Rii," for incorrect transcription |
| 58/13 | Change "Jean Allen, Sandra White," to "Jeanne Allen, Shandra White," for incorrect transcription |
| 76/18 | Change "reliance" to "Relias" for incorrect transcription |
| 82/3 | Change "reliance" to "Relias" for incorrect transcription |
| 90/23 | Change "High Point" to "Insight" for incorrect transcription |
| 153/16 | Change "Google 5" to "Google Fi" for incorrect transcription |
| 213/4 | Change "parents" to "patients" for incorrect transcription |
| 214/4 | Change "any" to "all" for incorrect transcription |
| 92/3-13 | Change "Goggle" to "Google" for incorrect transcription |
| 93/11 | Change "Goggle" to "Google" for incorrect transcription |
| 94/7 | Change "Goggle" to "Google" for incorrect transcription |
| 123/3-6 | Change "Xcel" to "Excel" for incorrect transcription |
| 123/18 | Change "Xcel" to "Excel" for incorrect transcription |
| 153/16 | Change "Google 5" to "Google Fi" for incorrect transcription |
| 198/23 | Change "Goggle" to "Google" for incorrect transcription |
| 201/4-5 | Change "Xcel" to "Excel" for incorrect transcription |

EXHIBIT
B

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Sheila M. Dunn, | Case No. 0:22-cv-00615-NEB-JFD |
| Plaintiff, | Judge Nancy E. Brasel |
| v. | Magistrate Judge John F. Docherty |
| Associates in Psychiatry and Psychology, P.A., Seth Franz, Priyanka Rao, Does 3–20, | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff, Sheila M. Dunn, states and alleges as follows:

## <u>THE PARTIES</u>

1.      Ms. Dunn is a natural person who resides in Winona County, Minnesota.

2.      Defendant Associates in Psychiatry and Psychology, P.A. ("APP") is a Minnesota corporation with its principal executive office address in Rochester, Minnesota.

3.      Defendant Seth Franz is a natural person who, upon information and belief, resides in Oak Park, Illinois.

4.      Defendant Priyanka Rao is a natural person who, upon information and belief, resides in Maple Grove, Minnesota.

5.      Upon information and belief, Defendants Does 3–5 are individuals of unknown residence.

6.      Upon information and belief, Defendants Does 6–10 are individuals of unknown residence.

7.     Upon information and belief, Defendants Does 11–15 are entities of unknown corporate form and residence.

8.     Upon information and belief, Defendants Does 16–20 are entities of unknown corporate form and residence.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as the case raises claims based upon federal statute. This Court further has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims. This Court has personal jurisdiction over Defendant APP as it is a corporation operating and located in the State of Minnesota.

10.     This Court has personal jurisdiction over Defendant Franz as, pursuant to Fed. R. Civ. P. 4 and Minn. Stat. § 543.19, he transacts business within the state.

11.     This Court has personal jurisdiction over Defendant Rao as she resides within the State of Minnesota.

12.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to claim occurred in Minnesota.

## FACTUAL BACKGROUND

13.     This case arises from Ms. Dunn's employment with APP, which began in or around May of 2020. APP has an annual dollar volume of business revenue in excess of $500,000.

2

14.     Ms. Dunn is a registered nurse and certified nurse practitioner who served in that role at APP in her first position following earning her nurse practitioner certification.

15.     APP is a mental health practice providing various forms of therapy, psychiatric, and psychological services.

16.     In April of 2020, APP offered employment to Ms. Dunn, and she accepted.

**The Written Employment Agreement**

17.     Later, to memorialize the employment relationship, APP forwarded to Ms. Dunn a written contract of employment (the "Employment Agreement"), a copy of which is attached as Exhibit 1.

18.     The Employment Agreement was at least partially incomplete, omitting various numbered paragraphs and failing to include information required by Minn. Stat. § 181.55.

19.     While the Employment Agreement acknowledged Ms. Dunn's status as an employee, it purported to compensate her based upon an illegal profit-sharing scheme.

20.     Specifically, the Employment Agreement provides as follows:

> **Compensation.**  The parties agree that, as for compensation employee will be paid sixty percent (60%) of collected receivables, which shall be understood to be those payments already collected and listed as 'payments' on the Monthly Provider Summary Report prepared by Employer's billing department and approved by Employer on the revenue that Employee personally generates for APP per month for each specific month, less all applicable local, state and federal withholdings, or other deductions employee wishes to take (examples: set asides for health savings account, medical or retirement savings accounts). Employee agrees that payment shall be made by Employer to Employee (or directly deposited by Employer to Employee's personal bank account), every

> other Friday based on the prior period's receipts and Employee shall sign all appropriate forms in a timely manner to facilitate payment. Should there be a holiday on one of these dates, paychecks will be deposited the following business day. Employee further understands that all case notes must be completed in order to bill for the session.

Employment Agreement, p. 2, ¶ 1.

21.     Upon information and belief, APP used the same or similar illegal language in its contracts with other employees.

22.     APP failed to provide the beginning-of-employment notices required by Minn. Stat. § 181.032(d).

23.     Throughout Ms. Dunn's employment, APP failed to provide accurate and complete earning statements as required by Minn. Stat. § 181.032 and the contract itself.

24.     Ms. Dunn regularly worked without pay on days when she was supposed to be relieved of duty for time off or to attend training.

25.     During these times she answered questions from patients and coworkers, often to the extent that she was unable to complete training exercises.

26.     Ms. Dunn made multiple requests for APP to provide her with Current Procedural Terminology ("CPT") codes and policies so that Ms. Dunn could bill patients properly.

27.     APP refused to provide all relevant CPT codes and policies.

28.     In July 2021, Ms. Dunn reported to APP that patients may be improperly billed because she was unsure of what needed to be included in notes to meet billing requirements for billing the codes APP required her to use.

29.     A short time after Ms. Dunn's report, APP summarily terminated Ms. Dunn's employment.

30.     APP has refused—and continues to refuse—to provide calculations showing the basis for and calculations of her compensation.

31.     APP has claimed to have "reason to believe" Ms. Dunn violated certain restrictive covenants but has failed to provide any evidence of those allegations.

32.     Upon information and belief, Defendants did not keep records of hours Ms. Dunn worked.

33.     APP paid Ms. Dunn less than the mandatory minimum wage for, at a minimum, the first month of Ms. Dunn's employment.

34.     APP has made vague legal threats to Ms. Dunn and the group with which she plans to provide care as an independent contractor.

35.     Multiple patients have informed Ms. Dunn that they need prescription refills, but they are not able to get them because APP refuses to authorize refills unless those patients come in for an appointment that is not available until after they run out of medication.

36.     APP has blamed Ms. Dunn for patient confusion although APP failed to comply with its contractual obligation to provide patients with a letter informing them of Ms. Dunn's departure, and for weeks after her departure her name, biography, and image were still on APP's website.

**Contractual Language**

37.     The alleged restrictive covenants in the Employment Agreement are stated in several contradictory ways.

38.     However, APP relies upon a provision without any geographic or practice scope limitations:

> Employee further agrees that, for a period of six months, measured from the date of Employee's separation from employment with Employer, Employee shall not, for any reason, without written consent by Employer, either personally or through or on behalf of another entity or individual, solicit or offer or provide service to any patient . . . .

Employment Agreement, p. 5, ¶ 9.

39.     APP relies upon this provision in its cease and desist letter to Ms. Dunn.

40.     Two other provisions purport to apply to Ms. Dunn if her employment is involuntarily terminated, but the provision APP seeks to enforce does not apply in that circumstance.

41.     The contract provides as follows:

> Employee further understands that Employer shall write an official letter to patients informing them of the Employees [sic] separation from the group and that the Employee will have the opportunity to co-sign the letter.

Employment Agreement, p. 6, ¶ 10.

42.     Not only did APP not comply with this provision, but its agents also attacked and blamed Ms. Dunn for the resulting patient confusion.

43. Instead of complying with the terms of the Employment Agreement, APP forced Ms. Dunn to expend many hours of unpaid work informing patients individually of her departure.

44. Ms. Dunn offered APP the opportunity to provide evidence that it complied with the Employment Agreement, and APP again declined.

45. APP appears to be concerned that Ms. Dunn has responded to patient inquiries regarding where she now plans to practice, but APP had declined to clarify what evidence it has of any conduct even potentially violative of the Employment Agreement.

46. Ms. Dunn invited APP to provide any legal authority that responding to patient inquiries could ever constitute improper competition or solicitation, even assuming an enforceable noncompete, and APP has not provided any.

**Personnel Records**

47. Ms. Dunn has demanded a copy of her personnel records in accordance with Minnesota law.

48. To date, Ms. Dunn's personnel records have not been provided to her.

**Demand for Payment of Wages**

49. Ms. Dunn has demanded in writing payment of all earned unpaid wages.

50. To date, APP has refused to provide Ms. Dunn a calculation of her wages or any payment of those wages yet unpaid.

**Underpayment**

51. Even based upon APP's illegal proposed compensation model, APP underpaid Ms. Dunn.

52.     For example, her commissions in the first quarter of 2021 appear to her to be significantly less than would be required, given her treatment of patients in the final quarter of 2020.

53.     Despite Ms. Dunn's request, APP has not provided the financial records showing the computation of Ms. Dunn's compensation.

54.     At a minimum, Ms. Dunn worked for the first two months of her employment with almost no compensation.

55.     In addition, APP has not paid Ms. Dunn for the last month of her work.

56.     Notably, this period of time included many hours of "transition" work that could not have been compensated by fee sharing even if APP had properly compensated her with fee sharing.

57.     The Employment Agreement indicates that Ms. Dunn would not be paid for much of her work performed over three full months because she did not give notice of her termination and APP had not yet been paid by patients or third-party payors:

> Employee shall continue to receive payments on receivables for ninety (90) days following the Employee's last date of employment on the following conditions: a) Employee has timely submitted the charge slips as described in paragraph #3 above; and b) Employee has given Employer ninety (90) days' notice. **Should the conditions of a through herein [sic] not be complied with, Employee acknowledges and agrees that she shall be paid only up to and including Employee's last day of employment, and only for prior billed and/or collected receipts as described in paragraph #3 above.** Employee agrees that any receivables still outstanding for services after last day of employment and past the 90-day period shall go towards Employer's recouping costs associated with advertising and hiring a new Employee.

Employment Agreement, p. 6, ¶ 10 (emphasis added).

58.     This provision conditions payment upon the application of "paragraph #3," which does not exist, and then only allows for payment of "billed and/or collected receipts[.]"

59.     Because APP has not provided any additional compensation or documentation regarding Ms. Dunn's compensation, presumably it believes this provision overrides Minnesota law.

60.     While it has not said so expressly, APP apparently relies upon this provision for its refusal to compensate Ms. Dunn for work performed toward the end of her employment.

**Wrongful Termination/Whistleblower Violation/Violation of MHRA**

61.     Ms. Dunn demanded information regarding her billing and wages and was only once provided any such information.

62.     Ms. Dunn made this demand in January of 2021 and was provided with incomplete information.

63.     APP refused to provide the information, claiming Ms. Dunn had already been provided with the information.

64.     APP did not explain why, even if that were true, Ms. Dunn would not be allowed to review a second copy of the information she needed to accurately bill patients.

65.     In early June 2021 the CEO of APP, Seth Franz, sent an email requesting to meet individually with the providers on a quarterly basis to better get to know the providers.

66.     Ms. Dunn scheduled a meeting with him for July 9, 2021.

67.     On July 1, 2021, Ms. Dunn had a pre-scheduled meeting with the clinical manager.

68.     At that meeting, Ms. Dunn complained that she needed additional information regarding how to code her billing properly.

69.     The clinical manager asked if Ms. Dunn was suggesting that the billing was fraudulent, and Ms. Dunn indicated she was not sure because she had not been provided with the requested information.

70.     At that meeting, APP criticized Ms. Dunn's work for the first time, and, asked what APP could do to support her work.

71.     Ms. Dunn indicated that, while she did not agree with the criticisms, she had been having difficulty concentrating.

72.     On July 7, 2021, Ms. Dunn disclosed in writing to her supervisor, Melanie Heu, that she had recently been tested for ADHD because she was having symptoms of distraction, forgetfulness, making mistakes, etc.

73.     The same day, Ms. Heu acknowledged the message and discussed with Ms. Dunn her "symptoms."

74.     Ms. Heu did not tell Ms. Dunn that a decision had been made to terminate Ms. Dunn's employment.

75.     Ms. Dunn met with Mr. Franz on July 9, 2021 as scheduled.

76.     At that meeting, APP terminated Ms. Dunn's employment.

77.     APP engaged in no interactive process to address whether Ms. Dunn had a disability or how APP could accommodate her.

78.     APP then interfered with Ms. Dunn's right to treat any patients.

79.     As a result of Defendants' actions, Ms. Dunn has suffered severe mental anguish and distress.

**The Individual Parties**

80.     Seth Franz is, and at all relevant times was, APP's CEO. As APP's CEO, he served on the leadership group that purportedly decided to terminate Ms. Dunn and told Ms. Dunn she had been terminated.

81.     Mr. Franz also served, during at least some of the time that Ms. Dunn worked at APP, as APP's director of operations, human resources manager, and compliance officer. In these capacities, he calculated Ms. Dunn's wages, and arranged for her to be paid. He did that work in the interest of APP in relation to Ms. Dunn.

82.     Priyanka Rao is APP's owner and chief clinical officer. As APP's owner and chief clinical officer, she served on the leadership group that purportedly decided to terminate Ms. Dunn. She also had operational control over clinical activities such as the ones in which Ms. Dunn was engaged. She acted in the interest of APP in relation to Ms. Dunn.

83.     Upon information and belief, Defendants Does 3–5 were also employers of Ms. Dunn or were joint employers of Ms. Dunn.

84.     Upon information and belief, Defendants Does 6–10 are APP's owners, agents or otherwise liable for the acts and omissions alleged in this Complaint.

85.     Upon information and belief, Defendants Does 11–15 were also employers of Ms. Dunn or were joint employers of Ms. Dunn.

86.     Upon information and belief, Defendants Does 16–20 are APP's owners, agents or otherwise liable for the acts and omissions alleged in this Complaint.

## CLAIMS

### COUNT I
### DECLARATORY RELIEF
**Uniform Declaratory Judgments Act**
**Minn. Stat. § 555.01, *et seq.***
**(Against Defendant APP)**

87.     Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

88.     As described in detail above, a present and judiciable controversy has arisen between the parties with regard to the Employment Agreement.

89.     APP has contended that various alleged restrictive covenants are binding and enforceable and prevent Ms. Dunn from seeing any patients.

90.     Specifically, through its counsel, APP wrote to Ms. Dunn on August 11, 2021 contending that the Employment Agreement "provides that during your employment with APP and for six months thereafter you 'shall not, for any reason without written consent by [APP], either personally or through or on behalf of another entity or individual, solicit or offer or provide service to any patient . . . .'"

91.     APP's counsel further threatened "APP has authorized us to take any and all measures, including legal action, to protect it from further harm and to compensate it for any damages[]" and threatened "the imminent potential for litigation . . . ."

92.     The alleged restrictive covenants are not enforceable against Ms. Dunn for several reasons, including lack of consideration, failure of consideration, material breach, unclean hands, illegality, overbreadth, and ambiguity.

93.     Nurse practitioners are not exempt employees for wage payment purposes unless they satisfy both the primary duties and the salary basis test.

94.     Because an agreement to pay an employee solely on a revenue basis is illegal, any reciprocal obligations on the part of the employee are also illegal and unenforceable.

95.     Ms. Dunn requests a declaration from this Court that the purported restrictive covenants are not enforceable.

## COUNT II
## BREACH OF CONTRACT
### (Against Defendant APP)

96.     Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

97.     The Employment Agreement exists between Ms. Dunn and APP as enforceable against APP because, to the extent the Employment Agreement provides for greater rights or compensation than would otherwise be legally required, such standards are incorporated into the legal compensation to be paid by statute and such contractual provisions are severable from the illegal or unenforceable provisions of the Employment Agreement pursuant to ¶ 17 of the Employment Agreement.

98.     The illegality of the compensation provision does not save an employer from paying the agreed-upon higher compensation if it is higher than would otherwise be provided by law.

99.     APP's actions and omissions, as more fully described above, breached the Employment Agreement including, without limitation, failure to pay Ms. Dunn's wages at the agreed upon rate and failure to properly advise patients of the end to Ms. Dunn's employment.

100.    All conditions precedent to APP's performance under the contact have been met.

101.    Ms. Dunn has suffered damages as a result of the breach of contract.

## COUNT III
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant APP)

102.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

103.    Each contract in the State of Minnesota includes an implied covenant to act in good faith and deal fairly with other parties to the contract.

104.    APP's actions, as more fully detailed above, breached its duty to perform under the contract addressed in Count II and to deal fairly with Ms. Dunn, including its refusal to notify patients of Ms. Dunn's departure, as required by the contract, then faulting her for the resulting patient confusion.

105.    Upon information and belief, APP intentionally miscalculated Ms. Dunn's compensation.

106.    APP failed—and continues to fail—to provide any support for its calculations of Ms. Dunn's compensation.

14

107.    Ms. Dunn has suffered damages as a result of those breaches, including earned but unpaid compensation.

## COUNT IV
## VIOLATION OF MINNESOTA FAIR LABOR STANDARDS ACT
### Minn. Stat. § 177.21, *et seq.*
### (Against All Defendants)

108.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

109.    Minnesota law requires that any employee not exempt under the Minnesota Fair Labor Standards Act ("MFLSA") or paid on a piece rate basis be compensated on an hourly wage basis and paid a premium for any hours in excess of 48 worked in a workweek based upon the employee's "regular rate of pay" which may or may not be the employee's direct hourly wage.

110.    APP and, as individuals who acted in APP's interest in relation to Ms. Dunn, Mr. Franz and Dr. Rao, qualify as employers pursuant to Minnesota law, including Minn. Stat. § 177.23, subd. 6.

111.    Upon information and belief, Does 3–5 and Does 11–15 are defined as "employers" pursuant to Minn. Stat. §177.23, subd. 6 and are also liable for any unpaid compensation.

112.    Defendants failed to compensate Ms. Dunn on an hourly wage basis with a premium for hours worked in excess of 48 in a workweek.

113.    Ms. Dunn has suffered damages as a result of Defendants' violations of the MFLSA.

114.    Ms. Dunn is entitled to recover her attorney fees and costs incurred in remedying APP's violations of the MFLSA.

**COUNT V**
**VIOLATION OF MINNESOTA PAYMENT OF WAGES ACT**
**Minn. Stat. § 181.13**
**(Against All Defendants)**

115.    Minn. Stat. § 181.13(a) provides, in relevant part, as follows:

> Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater.

116.    Minn. Stat. § 181.13(a) further provides as follows:

> When any employer employing labor within this state discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee. Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater.

117.    The agreement pleaded in Count II constitutes a contract, and Ms. Dunn is entitled to the highest promised compensation.

118.    APP has failed to pay Ms. Dunn all of her earned wages despite receiving a written demand.

119.    Ms. Dunn has suffered damages as a result of APP's violation of the statute.

120.    Minn. Stat. § 181.171 authorizes a civil action for a violation of Minn. Stat. § 181.13.

16

121.    Ms. Dunn is entitled to recover her earned, unpaid wages as well as a penalty consisting of an amount equal to 15 days of her average daily earnings.

122.    Ms. Dunn is entitled to an award of attorney fees and costs with regard to the demand and recovery of unpaid wages.

**COUNT VI**
**VIOLATION OF THE MINNESOTA WAGE THEFT PREVENTION ACT**
**Minn. Stat. §§ 177.30, 181.032, 181.101**
**(Against All Defendants)**

123.    The Minnesota Wage Theft Prevention Act was enacted to prevent exactly the type of conduct APP has engaged in. Specifically, Minnesota law requires that new employees receive detailed wage disclosure information, including information regarding wage payment, to be disclosed at the beginning of the employment relationship to help avoid wage and hour violations:

> (d) **At the start of employment**, an employer shall provide each employee a written notice containing the following information:
>
> (1) **the rate or rates of pay and basis thereof, including whether the employee is paid by the hour, shift, day, week, salary, piece, commission, or other method, and the specific application of any additional rates**;
> (2)  allowances, if any, claimed pursuant to permitted meals and lodging;
> (3)  paid vacation, sick time, or other paid time-off accruals and terms of use;
> (4) **the employee's employment status and whether the employee is exempt from minimum wage, overtime, and other provisions of chapter 177, and on what basis**;
> (5) **a list of deductions that may be made from the employee's pay**;

17

(6) the number of days in the pay period, the regularly scheduled pay day, and the pay day on which the employee will receive the first payment of wages earned;

(7) the legal name of the employer and the operating name of the employer if different from the legal name;

(8) the physical address of the employer's main office or principal place of business, and a mailing address if different; and

(9) the telephone number of the employer.

(e) **The employer must keep a copy of the notice under paragraph (d) signed by each employee acknowledging receipt of the notice**. The notice must be provided to each employee in English. The English version of the notice must include text provided by the commissioner that informs employees that they may request, by indicating on the form, the notice be provided in a particular language. If requested, the employer shall provide the notice in the language requested by the employee. The commissioner shall make available to employers the text to be included in the English version of the notice required by this section and assist employers with translation of the notice in the languages requested by their employees.

(f) An employer must provide the employee any written changes to the information contained in the notice under paragraph (d) prior to the date the changes take effect.

Minn. Stat. § 181.032(d)–(f) (emphasis added).

124.   APP never provided the required notice.

125.   Ms. Dunn requested that APP provide a copy of the notice signed by Ms. Dunn, and APP has not done so.

126.   APP also violated Minnesota law with respect to providing Ms. Dunn earning statements. Specifically, the following is required:

(a) At the end of each pay period, the employer shall provide each employee an earnings statement, either in writing or by electronic means, covering that pay period. An employer who chooses to provide an earnings statement by electronic means must provide employee access to an employer-owned computer during an employee's regular working hours to review and print earnings statements.

(b) The earnings statement may be in any form determined by the employer but must include:

(1) the name of the employee;

(2) **the rate or rates of pay and basis thereof, including whether the employee is paid by hour, shift, day, week, salary, piece, commission, or other method**;

(3) allowances, if any, claimed pursuant to permitted meals and lodging;

(4) **the total number of hours worked by the employee unless exempt from chapter 177**;

(5) the total amount of gross pay earned by the employee during that period;

(6) **a list of deductions made from the employee's pay**;

(7) the net amount of pay after all deductions are made;

(8) the date on which the pay period ends;

(9) the legal name of the employer and the operating name of the employer if different from the legal name;

(10) the physical address of the employer's main office or principal place of business, and a mailing address if different; and

(11) the telephone number of the employer.

Minn. Stat. § 181.032(a) (emphasis added).

127.    Ms. Dunn's earning statements do not comply with the law, failing at least in the areas noted above in boldface text.

128.    The Employment Agreement provides that APP will deduct from pay a portion of its MinnesotaCare Provider Tax from Ms. Dunn's wages.

129.    Ms. Dunn's earning statements do not indicate any deductions for that purpose, which means that deductions were taken without proper notice.

130.    Minnesota law further required APP to keep detailed records of Ms. Dunn's compensation:

> (a)    Every employer subject to sections 177.21 to 177.44 must make and keep a record of: (1) the name, address, and occupation of each employee; (2) the rate of pay, and the amount paid each pay period to each employee; (3) the hours worked each day and each workweek by the employee, including for all employees paid at piece rate, the number of pieces completed at each piece rate; (4) a list of the personnel policies provided to the employee, including the date the policies were given to the employee and a brief description of the policies; (5) a copy of the notice provided to each employee as required by section 181.032, paragraph (d), including any written changes to the notice under section 181.032, paragraph (f);

Minn. Stat. § 177.30.

131.    Upon information and belief, APP did not keep such records.

132.    APP has refused to provide Ms. Dunn with any such records.

133.    The Minnesota Wage Theft Prevention Act provides as follows:

> (a) Except as provided in paragraph (b), every employer must pay all wages, including salary, earnings, and gratuities earned by an employee at least once every 31 days and all commissions earned by an employee at least once every three months, on a regular payday designated in advance by the

20

employer regardless of whether the employee requests payment at longer intervals. Unless paid earlier, the wages earned during the first half of the first 31-day pay period become due on the first regular payday following the first day of work. If wages or commissions earned are not paid, the commissioner of labor and industry or the commissioner's representative may serve a demand for payment on behalf of an employee. In addition to other remedies under section 177.27, if payment of wages is not made within ten days of service of the demand, the commissioner may charge and collect the wages earned at the employee's rate or rates of pay or at the rate or rates required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater, and a penalty in the amount of the employee's average daily earnings at the same rate or rates for each day beyond the ten-day limit following the demand. If payment of commissions is not made within ten days of service of the demand, the commissioner may charge and collect the commissions earned and a penalty equal to 1/15 of the commissions earned but unpaid for each day beyond the ten-day limit. Money collected by the commissioner must be paid to the employee concerned. This section does not prevent an employee from prosecuting a claim for wages. . . . For purposes of this section, wages are earned on the day an employee works. This section provides a substantive right for employees to the payment of wages, including salary, earnings, and gratuities, as well as commissions, in addition to the right to be paid at certain times.

Minn. Stat. § 181.101.

134.    APP failed to pay Ms. Dunn in accordance with this statute.

135.    Despite demand, APP has refused to pay Ms. Dunn pursuant to this statute.

Ms. Dunn is entitled to a penalty for this failure pursuant to Minn. Stat. § 181.101.

136.    Ms. Dunn is entitled to an award of attorney fees and costs with regard to the

demand and recovery of unpaid wages.

137.    Upon information and belief, Does 3–5 and Does 11–15 are joint employers of Ms. Dunn and are also liable for failing to properly pay Ms. Dunn

138.    Upon information and belief, Does 6–10 are owners of APP and are also liable for APP's failure to pay Ms. Dunn properly.

## COUNT VII
## UNJUST ENRICHMENT
### (Against All Defendants)

139.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

140.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

141.    Ms. Dunn performed labor for APP and to the benefit of all Defendants, but Ms. Dunn has not been fully paid for her labor.

142.    All Defendants have been unjustly enriched through their interests in APP's profits by retaining wages earned by Ms. Dunn.

143.    Injustice would result if Defendants were allowed to retain this benefit.

144.    Accordingly, Defendants should be required to pay to Ms. Dunn the wages she has earned.

## COUNT VIII
## QUANTUM MERUIT
### (Against All Defendants)

145.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

146.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

147.   Ms. Dunn performed labor for APP and to the benefit of all Defendants, but Ms. Dunn has not been fully paid for her labor.

148.   The reasonable value of the labor Ms. Dunn provided greatly exceeded the compensation she received.

149.   As detailed more fully above, at times, Ms. Dunn received no payment for her labor.

150.   Ms. Dunn reasonably expected to be paid for the reasonable value of her labor.

151.   Injustice would result if Defendants are not required to compensate Ms. Dunn for the reasonable value of her labor.

152.   Accordingly, Defendants should be required to pay to Ms. Dunn the wages she has earned.

**COUNT IX**
**WRONGFUL TERMINATION/WHISTLEBLOWER VIOLATION**
**Minn. Stat. § 181.932**
**(Against Defendant APP)**

153.   Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

154.   The Minnesota Whistleblower Act provides:

Prohibited action. An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or

rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(2) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason;

(4) the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm;

. . .

Minn. Stat. § 181.932, subd. 1.

155.   Ms. Dunn made good faith reports that she believed she was given incomplete information regarding billing codes and demanded additional information.

156.   Ms. Dunn made expressed good faith concerns that her compensation was not being properly calculated.

157.   Shortly after Ms. Dunn's report, APP terminated Ms. Dunn's employment.

158.   APP's termination of Ms. Dunn's employment was motivated at least in part by her complaints of improper billing and failure to account for and pay her compensation.

159.   Ms. Dunn has suffered damages as a result of APP's retaliatory termination, including past and future lost wages and benefits and the costs of bringing this action.

## COUNT X
## FAILURE TO PROVIDE PERSONNEL RECORDS
### Minn. Stat. § 181.961
### (Against Defendant APP)

160.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

161.    Ms. Dunn demanded that APP provide her a copy of her personnel records.

162.    More than seven working days have elapsed since Ms. Dunn's request, and APP has provided no personnel records.

163.    Ms. Dunn incurred damages including attorney fees as a result of APP's refusal to provide copies of Ms. Dunn's personnel records.

## COUNT XI
## VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT ("FLSA")
### (Against All Defendants)

164.    Ms. Dunn incorporates the allegations in the preceding paragraphs as if the same were fully set forth herein.

165.    The FLSA requires covered employers to pay non-exempt employees no less than one-and-one-half times their regular rate of pay for all hours worked in excess of forty hours in a workweek. 29 U.S.C. § 207.

166.    APP and, as individuals who acted in APP's interest in relation to Ms. Dunn, Mr. Franz and Dr. Rao, qualify as employers pursuant to 29 U.S.C. § 203(d).

167.    Defendants are an "enterprise" as defined by the FLSA, 29 U.S.C. § 203(r)(1), and are engaged in commerce within the meaning of the FLSA, § 203(b), (s)(1).

168.   Upon information and belief, Does 3–5 and Does 11–15 are joint employers of Ms. Dunn and are also liable for failing to properly pay Ms. Dunn

169.   Upon information and belief, Does 6–10 are owners of APP and are also liable for APP's failure to pay Ms. Dunn properly.

170.   Ms. Dunn is a non-exempt covered employee under 29 U.S.C. § 203(e)(1).

171.   Ms. Dunn has worked more than forty hours per week for Defendants during the applicable time period.

172.   Defendants have not properly compensated Ms. Dunn for their overtime hours as required by the FLSA.

173.   Defendants failed to make a good-faith effort to comply with the FLSA as it relates to the compensation of Ms. Dunn.

174.   Defendants knew Ms. Dunn worked overtime without proper compensation, and they willfully failed and refused to pay Ms. Dunn wages at the required overtime rates. *See* 29 U.S.C. § 255.

175.   Defendants' willful failure and refusal to pay Ms. Dunn overtime wages for time worked violates the FLSA. 29 U.S.C. § 207.

176.   Defendants failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions of employment, in violation of the FLSA, 29 U.S.C. § 255(a).

177.   Ms. Dunn has been damaged by Defendants' willful violations of the FLSA and has suffered a loss of income and other damages.

178.   Ms. Dunn is entitled to liquidated damages and attorney fees and costs incurred as a result of this claim.

## COUNT XII
## FAILURE TO TIMELY PAY WAGES
## Minn. Stat. § 181.101
## (Defendant APP)

179.   Ms. Dunn incorporates the allegations in the preceding paragraphs as if the same were fully set forth herein.

180.   During the course of Ms. Dunn's employment, Defendant APP regularly failed to pay Ms. Dunn within 31 days of the date the wages were owned.

181.   More than 10 days have passed since Ms. Dunn has demanded her earned but unpaid wages.

182.   Ms. Dunn has been damaged by Defendant's APP failure to timely pay her earned wages.

183.   Ms. Dunn is entitled to damages in the amount of her unpaid wages, as well as applicable statutory penalties for Defendant APP's failure to timely pay wages, as well as attorney fees and costs incurred as a result of this claim.

## COUNT XIII
## VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT
## Minn. Stat. 363A.01, et seq.
## (Against All Defendants)

184.   Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

185.   Ms. Dunn was and is qualified to work in her position with APP.

186.   Ms. Dunn informed APP that she had been recently tested for ADHD.

27

187.    APP regarded Ms. Dunn as a person with a disability.

188.    APP terminated Ms. Dunn at least in part as a result of its regarding her as a person with a disability.

189.    APP's proffered reasons for terminating Ms. Dunn's employment is not worthy of credence because, despite claiming to have documentation of its alleged bases, it did not provide those as part of Ms. Dunn's personnel records and may not rely upon them—if they exist—pursuant to Minn. Stat. § 181.963.

190.    Accordingly, Ms. Dunn has been damaged on the basis of the actions taken by APP to discriminate against her employment on the basis of disability.

## COUNT XIV
## PROMISSORY ESTOPPEL
### (Against All Defendants)

191.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

192.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

193.    APP made a clear and definite promise to pay Ms. Dunn on the basis set forth in the employment agreement.

194.    APP, as the promisor, intended to induce reliance, and Ms. Dunn, as the promise, in fact relied on the promise to her detriment.

195.    In the absence of an adequate remedy at law, the promise must be enforced to prevent injustice.

196.    Ms. Dunn has suffered damages as a result of APP's failure to fulfill its promise.

## **<u>REQUEST FOR RELIEF</u>**

Plaintiff, Sheila M. Dunn, requests that the Court:

1.      Enter judgment in her favor and against Defendants for each of the claims asserted in this Complaint;

2.      Declare the noncompete/nonsolicit restrictive covenants contained in the Employment Agreement to be unenforceable;

3.      Enjoin Defendants and anyone acting on their behalf from attempting to enforce the noncompete/non-solicit restrictive covenants contained in the Employment Agreement or threatening Plaintiff or any third party with any enforcement action;

4.      Enter judgment in favor of Ms. Dunn and against APP, Mr. Franz, Dr. Rao, and Does 3–20 jointly and severally in an amount greater than $50,000, to include compensatory damages, to include front and back pay;

5.      Award Ms. Dunn liquidated damages for unpaid wages;

6.      Award Ms. Dunn the full statutory penalties for failure to timely pay wages;

7.      Award Ms. Dunn her legal expenses, including attorney fees, costs, and disbursements; and

8.      Award all other relief the court deems just and equitable.

Dated: _____, 2022           **GODWIN DOLD**

<u>/s/</u>
James A. Godwin, #392020
Rick A. Dold, #394847
300 1st Ave. NW, Suite 306
Rochester, MN  55901
Telephone: 507-218-8383
james@godwindold.com
rick@godwindold.com

**ATTORNEYS FOR PLAINTIFF**

## ASSOCIATES IN PSYCHIATRY AND PSYCHOLOGY, P. A.

### EMPLOYMENT AGREEMENT

This Agreement is made and entered into by and between Associates in Psychiatry and Psychology, P.A. (hereinafter referred to as "Employer") and <u>Sheila Dunn</u>    (hereinafter referred to as "Employee").

### I. RECITALS

A.    Employee is an appropriately qualified professional and has completed all updates to maintain licensing and education and to practice at the highest ethical, clinical and other relevant standards; and Employee has represented all her qualifications and background factors in a truthful and accurate manner to Employer.

B.    Employer is a well-established Professional Association providing various mental health services for patients and organizations in Faribault, Rochester and Southeastern Minnesota.

C.    Employer and Employee wish to enter into an 'at will' employment arrangement and this Agreement provides the purpose, terms and conditions under which the parties will conduct their employment relationship.

### II. AGREEMENT

In consideration of the recitals stated above and the mutual promises made below, the parties agree as follows:

1.  **Term of Employment.**  Employee specifically acknowledges, understands and agrees that the employment addressed in this contract is "employment at will", and means that Employee has not been hired for any definite period of employment, and that either Employer or Employee may terminate their employment relationship at any time, for any reason, with or without cause, notice or prior discipline. Employee further understands and specifically acknowledges and agrees that no offers, promises, guarantees or representations of employment or of its terms or conditions or duration have been made to Employee other than what is written here, and that Employer makes no such offers, promises, guarantees or representations to Employee other than what is written here; further, that at no time shall Employer and Employee's relationship be construed to afford Employee any rights other than what is specifically addressed in this contract. Employee shall commence working for Employer as a practitioner _____ , 2020.

    **Description of Employment.**  Employee is employed for the purpose of providing psychiatric services for patients in line with the expectations set forth in this agreement. In some cases, Employee shall provide such services for patients referred by Employer and, in other cases, for patients acquired by Employee. Employee understands and agrees that all

Exhibit 1

patients are patients of Associates in Psychiatry and Psychology, P.A. (APP) as Employer and not of Employee individually. Employee specifically represents to Employer and agrees that he shall maintain thorough and up to date electronic health records of all services for each appointment and service provided and shall ensure that the billing department receives all of Employee's daily charge slips promptly. Employer provides training on use of the EHR system and retains a service to troubleshoot any problems with the records system. Employer will provide a computer for business usage. Employer will provide appointment scheduling, appointment confirmation calls, insurance verification, billing services, collection services, prior authorization updates, provider network updates, insurance network credentialing, calculation and submission of Employee's portion of the Minnesota Care taxes, receptionist duties, mail, scanning and fax processing, patient reminder calls or texts, file management, direct deposit paychecks and monthly provider and administrative reports. All facilities management such as snow plowing, building maintenance, lawn maintenance, office cleaning, coffee and tea service are provided by Employer. Employer also provides all furnishing and decorations for Employee's office. Employer will provide a medical assistant to Employee with duties defined by Employees practice needs.

Employee further understands and agrees that, if at any time Employee has questions or concerns as to the substance or procedure involved in any services referred to herein, Employee shall promptly raise such questions or concerns with the provider relations manager.

**Compensation.** The parties agree that, as for compensation employee will be paid sixty (60%) of collected receivables, which shall be understood to be those payments already collected and listed as 'payments' on the Monthly Provider Summary Report prepared by Employer's billing department and approved by Employer) on the revenue that Employee personally generates for APP per month for each specific month, less all applicable local, state and federal withholdings, or other deductions employee wishes to take (examples: set asides for health savings account, medical or retirement savings accounts). Employee agrees that payment shall be made by Employer to Employee (or directly deposited by Employer to Employee's personal bank account), every other Friday based on the prior period's receipts and Employee shall sign all appropriate forms in a timely manner to facilitate payment. Should there be a holiday on one of these dates, paychecks will be deposited the following business day. Employee further understands that all case notes must be completed in order to bill for the session.

Furthermore, employee understands and agrees that Employer does not pay sick leave or vacation days at any time and that he shall receive no payment therefore. Employee understands and agrees that Employer does not pay for individual expenses such as travel, books, professional journals or memberships in professional organizations. Employee is responsible for and shall pay for all such expenses such as continuing education credits, license renewals and malpractice insurance. As a condition of Employee's employment, Employee shall use her reasonable efforts to promote the business and practice of Employer and Employee. Additionally, Employer agrees to provide, in its sole discretion, periodic media advertisements, professional website presence, social media presence, individual "door" nameplate, business cards, professional letterhead for business correspondence, personalized business e-mail and internal communications between employees. Employee agrees that Employee's consent and authorization shall be assumed as having been given for any advertising undertaken by Employer to further Employer's and Employee's interests regarding APP. Employee further agrees that Minnesota Care Tax is the shared responsibility

of Employer and Employee and that Employer shall deduct Employee's share, which shall be Sixty (60%) beginning with first paycheck on collected payments.

**Insurance.** Employee will maintain individual professional malpractice coverage, with a minimum of $ 1,000,000.000 single/ $3,000,000.00 aggregate coverage, which shall be primary. Employer maintains an umbrella malpractice policy for the practice which is a second layer of protection above and beyond the individual employee's coverage. Employer also retains a professional risk management group which provides consultation and attorney representation should a professional complaint be lodged against an Employee.

5. **Benefits.** Employee is eligible to participate in the pre-tax SEP IRA plan with matching funds provided by Employer. Employer provides a financial consultant for Employee who wishes support in financial planning. An Employee who works a minimum of .5 FTE (20 hours per week) is eligible to participate in the Dental Plan. An Employee who works full time (24 sessions per week) is eligible to participate in the medical benefits plan.

6. **Employer's Practice Expectations of Employee.** Employee understands that Employer has the following practice expectations of Employee and agrees that he will comply:

   a. Employee's professional credentials **must** be displayed at all times.

   b. As a member of Employer's practice, Employee shall contribute to its overall positive image and environment by his professional demeanor, conduct, acts, writing and representation and shall willingly participate in office activities related to the running and promotion of the practice at all times.

   c. Employee shall attend and from time to time present on a professional topic, in the once a month staff meetings in a positive and professional manner, and is encouraged to volunteer for a minimum of one speaking engagement and at least one time per year when he represents Employer in the public forum, doing so outside of business hours and without compensation therefore.

   d. Upon Employee's taking FMLA time, Employee's job can be held for six (6) months subject to, agreement by the Employer in writing, Employee's satisfactory compliance with notice and conditions for leave set by Employer, and based on "no undue business hardship" to Employer. Employee understands that office space is limited and upon return may have a shared office space arrangement if no single offices are available.

   e. Employee shall use any APP office or practice equipment such as telephone, fax, computer, supplies and similar items, **only** for work related activities.

   f. Employee is responsible for completing all professional correspondence, professional reports, intake assessments, progress notes and completion of all mandated reporting requirements such as PHQ-9's, etc.

   g. Employee agrees to limit referrals to outside clinics or practitioners unless to do so is in the patient's best interest or in the case where there is a need for a higher level of care such as a day treatment program or an in-patient treatment facility.

h. In the event that Employee's illness necessitates cancellation of patient appointments, Employee shall make her best effort to re-schedule such patient/s within the same week as the appointment cancelled.

i. All vacation days and sick leave days taken by Employee are unpaid. To ensure the patients' best interests in the event that Employee takes vacation time, Employee is encouraged to provide notice to support staff of her proposed dates of absence, a minimum of thirty (30) days (or as soon as possible) in advance.

j. No loans or salary advances shall be made to Employee or received by Employee from Employer at any time and no loans or personal financial transactions shall be undertaken by Employee with or for any other APP employee/s.

k. Employee shall familiarize herself with Employer's Policies and Procedures Handbook and shall follow all policies but understands, acknowledges and agrees that Employer reserves the right and has the right to reserve and change its policies and procedures at any time without further notice. Employee specifically acknowledges and agrees that none of Employer's policies or procedures or the Policy and Procedure Handbook itself create any employment offers, promises, guarantees, representations or rights for Employee outside of what is written in this Agreement.

l. Employee shall make an effort to have a current knowledge of all insurance updates, managed care network guidelines and re-credentialing guidelines during employment.

m. Employee is solely responsible to complete patient reports and requests for information in a prompt and timely manner.

n. Employee shall maintain a current knowledge of all licensing requirements, mandatory reporting, HIPAA and other laws relevant to practicing in the mental health field and shall comply with all legal requirements and the highest possible ethical standards therein. Any violation of licensing and other laws and ethics described herein breaches the material terms of this Agreement and is an example of conduct, which could result in immediate termination.

7. **Patient Data.** Employee specifically understands and agrees that all patient files, computer records and data of any description are the property of Employer and that no file or information concerning a patient may be taken out of APP's facility unless necessary, and on any occasion, unless transported by Employee in a locked container or password protected computer. Employee further understands and agrees that all patient data shall be held in the strictest confidence and that a violation of patient confidentiality is an example of conduct which could warrant immediate dismissal. Employee agrees and shall sign APP's Confidentiality Agreement, which shall be attached hereto, and made a part hereof and incorporated herein. Employee understands, acknowledges and agrees that Employer has all final decision-making authority with respect to procedures involving patients, their files and accounts. Employee further understands that her wishes will be taken into consideration regarding charging for no show appointment or requests that a patient not be sent to collections due to extenuating circumstances.

8. **Outside Employment/Non-Compete.** Employee acknowledges and agrees that through

APP, he may upon his approval, from time to time, be introduced to and provide services for, discuss, pursue or accept any professional consulting, service or employment arrangement with or through any such outside business or agency outside of services performed by Employee on APP's behalf, without Employer's express consent and authorization in writing. Employee further agrees that he shall not discuss, pursue or accept any professional consulting, service or employment arrangement with or through any outside independent facility offering substantially the same or equivalent services as APP at any time during employment at APP, without Employer's express consent and authorization in writing. Employee understands, acknowledges and agrees that the breach of this paragraph and any of its terms is an example of conduct breaching material terms of this Agreement and which could be grounds for immediate termination. Employee acknowledges and agrees that nothing in this paragraph or agreement is intended to interfere with Employee's professional status or pursuit of his livelihood or the best interests of a patient

9. **Post Termination Non-Compete and Solicitation.** Employee understands, acknowledges and agrees that Employer's obligation is to assure the best treatment possible for its patients and to protect its customer goodwill and interests and that the agreements contained in this Agreement and paragraph are made for that purpose. Employee agrees that, for a period of six months, measured from the date of Employee's separation from employment with Employer, whether or not Employee is terminated from employment, Employee shall not, directly or indirectly, provide work or services at or for any outside entity offering the same or equivalent services as APP within a thirty (30) mile radius of any APP office or facility. Employee further agrees that, for a period of six months , measured from the date of Employee's separation from employment with Employer, Employee shall not, for any reason, without written consent by Employer, either personally or through or on behalf of another entity or individual, solicit or offer or provide service to any patient, or solicit or offer to employ or employ any individual employed by or formerly employed by Employer, or request, advise or entice any such individual to leave the employment of Employer.

This non-compete strives to be as limited in scope as possible. The non-compete does not restrict or interfere with former employee's right to work in hospital settings, prison setting, educational settings, research institutions, day treatment programs or county, state or federal positions. The non-compete is solely in place to prevent previous employees from direct competition with the services provided at APP and to prevent the transfer of APP patients to other clinics.

The following restriction is therefore in place. Former employee is prohibited from opening a private practice or joining an established out-patient therapy group, practice or clinic for a period of six months from date of separation for a distance of 30 mile radius in any direction from the Rochester office or any APP office worked at over the previous 12 months.

10. **Covenant re. Proprietary Data.** Employee agrees without time limitation that he will not retain, copy, use or disclose any confidential or proprietary information, or any other sensitive information of Employer, during or following Employee's separation from employment, no matter what the nature, reasons or circumstances of that separation.

Employee further acknowledges and agrees that confidential proprietary and sensitive information includes but is not limited to, personal, financial, research, organizational, treatment, business, service and prescription pricing and discount, patient, policy, software or other information developed by Employer or its employees, and any and all documents prepared by or in the course of employment with Employer, including all copies thereof, whether in documentary, computer storage, audio/video tape or other medium or form. Employee further understands and agrees that any research work and conclusions, endeavors, consequences or products including but not limited to financial, resulting from Employee's work or Employee's collaboration with inside or outside persons regarding work he performs at or for APP during the time of his employment with Employer, is the property of Employer, unless the parties agree otherwise in writing.

**Termination of Employment.** Out of regard for the best interests of the patients, in the event that Employee wishes to terminate the employment relationship with Employer, Employer requests, but does not require, that Employee provides written notice of termination to Employer a minimum of ninety (90) days prior to the desired termination date with flexibility in providing more notice to assure enough time to hire a new provider to fill the vacated position. Employee specifically acknowledges and agrees that the actual date of termination may be set at any time during the ninety (90) days' notice period using reasonable discretion. Employee agrees that in the event of Employee's termination of employment with Employer, in order to ensure patient best interests and a smooth transition, Employee's patient caseload shall be transferred to other practitioners with Employer, according to area of expertise and patient need. Employee agrees that she will cooperate in all regards with Employer and other practitioners and staff regarding any matters and issues that arise or any facts about which Employee may have knowledge, whether during or after patient transfer. Employee further agrees that, in the event that any issue concerning a patient handled by Employee arises during or after the time that Employee has separated from employment with Employer, Employee will cooperate fully with Employer, its insurers, attorneys or other equivalent agent's or representative's requests concerning whatever issue, matter or fact is in question, including but not limited to giving testimony on behalf of Employer. Employee acknowledges the necessity of obtaining tail malpractice insurance and this is to be deducted from his final paycheck. Employee shall continue to receive payments on receivables for ninety (90) days following the Employee's last date of employment on the following conditions: a) Employee has timely submitted the charge slips as described in paragraph #3 above; and b) Employee has given Employer ninety (90) days' notice. Should the conditions of a through herein not be complied with, Employee acknowledges and agrees that he shall be paid only up to and including Employee's last day of employment, and only for prior billed and/or collected receipts as described in paragraph #3 above. Employee agrees that any receivables still outstanding for services after last day of employment and past the 90-day period shall go towards Employer's recouping costs associated with advertising and hiring a new Employee. The parties also agree that Employee may not copy professional reports, research or case file notes upon leaving APP. Employee further understands that Employer shall write an official letter to patients informing them of the Employees separation from the group and that the Employee will have the opportunity to co-sign letter.

11. **APP's Reservation of Rights**. Employer retains all necessary rights to operate and direct. APP and its affairs in all aspects and to make final decisions in that regard, during and after Employee's employment. The parties agree that Employer's judgment in connection with the rights referred to herein and the implementation thereof shall not be the subject of any claim against Employer/APP by Employee. Employer agrees to consult with employee in matters connected to billed fees and services and will not reverse or return fees billed or received without written approval of employee.

12. **Injunctive Relief**. The parties acknowledge and agree that the covenants contained in this Agreement are for the protection of Confidential Information together with patient best interests, goodwill and Employer's other bona fide protectable interests and that a breach of any covenant in this Agreement may cause serious and irreparable damage to Employer. Employee agrees that damages at law would be an inadequate remedy for a breach of the covenants contained herein and that, in addition to any and all other remedies at law to which Employer would otherwise be entitled, Employer shall be entitled to injunctive relief with respect to any breach by Employee of this Agreement's covenants.

13. **Non-Assignment**. The parties agree that this Agreement and its rights and duties shall not be assignable by either party unless the other party agrees in writing.

14. **Merger**. This Agreement and the provisions herein supersede all prior oral and written agreements and communications between the parties.

15. **Entire Agreement**. The parties agree that this Agreement constitutes their entire agreement and there were no inducements or representations leading to the execution of this Agreement except as contained here.

16. **Modification**. This Agreement may not be modified by either party except in writing and agreed by both parties.

17. **Severability**. In case any one or more of the provisions of this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of this Agreement's remaining provisions shall not be affected or impaired in any way thereby.

18. **Controlling Law**. The parties agree that the law of the State of Minnesota shall control the interpretation and enforcement of this Agreement.

19. **Gender**. Any reference to the masculine gender is intended to refer also to the feminine, and likewise, any use of the singular is intended to refer to the plural as appropriate, and the masculine gender is used only for simplicity and not for any discriminatory purpose.

8.

20. **Voluntary and Knowing Action,** Employee agrees and acknowledges that she has had the opportunity to consult with an attorney of his/her choice and to have this Agreement reviewed, and that Employee has read and understands the terms of this Agreement and is voluntarily signing and entering into this Agreement.

Dated: Employer

ASSOCIATES IN PSYCHIATRY
AND PSYCHOLOGY, PA.

_____

Franklin Merchant, Associates in Psychiatry and Psychology

Sheila Dunn, APRN, CNP/PMHNP 04/24/2020

**EXHIBIT C**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

| STATE OF MINNESOTA | DISTRICT COURT – CIVIL DIVISION |
|---|---|
| Sheila M. Dunn, | Case No. 0:22-cv-00615-NEB-JFD |
| Plaintiff, | Judge Nancy E. Brasel |
| v. | Magistrate Judge John F. Docherty |
| Associates in Psychiatry and Psychology, P.A., Seth Franz, Priyanka Rao, Does 3–20, | SECOND AMENDED COMPLAINT |
| Defendants. | |
| COUNTY OF WINONA | THIRD JUDICIAL DISTRICT |
| Sheila M. Dunn, | Hon. Nancy L. Buytendorp |
| Plaintiff, | Case Type: Employment |
| v. | Case No. 85-CV-21-1472 |
| Associates in Psychiatry and Psychology, P.A. and Does 1–20, | AMENDED COMPLAINT |
| Defendants. | |

Plaintiff, Sheila M. Dunn, states and alleges as follows:

## THE PARTIES

1. Ms. Dunn is a natural person who resides in Winona County, Minnesota.

2. Defendant Associates in Psychiatry and Psychology, P.A. ("APP") is a Minnesota limited liability company corporation with its primary place of business principal executive office address in Rochester, Minnesota and that provides service throughout the State of Minnesota.

3.      Defendant Seth Franz is a natural person who, upon information and belief, resides in Oak Park, Illinois.

4.      Defendant Priyanka Rao is a natural person who, upon information and belief, resides in Maple Grove, Minnesota.

~~3.~~5.    Upon information and belief, Defendants Does ~~1~~3–5 are individuals of unknown residence.

~~4.~~6.    Upon information and belief, Defendants Does 6–10 are individuals of unknown residence.

~~5.~~7.    Upon information and belief, Defendants Does 11–15 are entities of unknown corporate form and residence.

~~6.~~8.    Upon information and belief, Defendants Does 16–20 are entities of unknown corporate form and residence.

**JURISDICTION AND VENUE**

~~7.~~9.    This Court has subject matter jurisdiction over this ~~matter because~~ case pursuant to 28 U.S.C. § 1331, as the ~~actions~~case raises claims based upon federal statute. This Court further has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims. This Court has personal jurisdiction over Defendant APP as it is a corporation operating and ~~omissions giving rise to the action occurred primarily~~located in the State of Minnesota.

10.     This Court has personal jurisdiction over Defendant Franz as, pursuant to Fed. R. Civ. P. 4 and Minn. Stat. ~~Winona County is the proper venue for this matter because Ms. Dunn resides in Winona County and at all times while providing telemedicine services~~

2

described in this Complaint did so from her home in Winona County. § 543.19, he transacts business within the state.

11.    This Court has personal jurisdiction over Defendant Rao as she resides within the State of Minnesota.

8.12.   Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to claim occurred in Minnesota.

**FACTUAL BACKGROUND**

9.13.   This case arises from Ms. Dunn's employment with APP, which began in or around May of 2020. APP has an annual dollar volume of business revenue in excess of $500,000.

10.14.   Ms. Dunn is a registered nurse and certified nurse practitioner who served in that role at APP in her first position following earning her nurse practitioner certification.

15.    APP is a mental health practice providing various forms of therapy, psychiatric, and psychological services.

11.16.  In April of 2020, APP offered employment to Ms. Dunn, and she accepted.

**The Written Employment Agreement**

12.17.  Later, to memorialize the employment relationship, APP forwarded to Ms. Dunn a written contract of employment (the "Employment Agreement"), a copy of which is attached as Exhibit 1.

13.18. The Employment Agreement was at least partially incomplete, omitting various numbered paragraphs and failing to include information required by Minn. Stat. § 181.55.

14.19. While the Employment Agreement acknowledged Ms. Dunn's status as an employee, it purported to compensate her based upon an illegal profit-sharing scheme.

15.20. Specifically, the Employment Agreement provides as follows:

> **Compensation.** The parties agree that, as for compensation employee will be paid sixty percent (60%) of collected receivables, which shall be understood to be those payments already collected and listed as 'payments' on the Monthly Provider Summary Report prepared by Employer's billing department and approved by Employer on the revenue that Employee personally generates for APP per month for each specific month, less all applicable local, state and federal withholdings, or other deductions employee wishes to take (examples: set asides for health savings account, medical or retirement savings accounts). Employee agrees that payment shall be made by Employer to Employee (or directly deposited by Employer to Employee's personal bank account), every other Friday based on the prior period's receipts and Employee shall sign all appropriate forms in a timely manner to facilitate payment. Should there be a holiday on one of these dates, paychecks will be deposited the following business day. Employee further understands that all case notes must be completed in order to bill for the session.

Employment Agreement, p. 2, ¶ 1.

16.21. Upon information and belief, APP used the same or similar illegal language in its contracts with other employees.

17.22. APP failed to provide the beginning-of-employment notices required by Minn. Stat. § 181.032(d).

Formatted: Font: 13 pt

Formatted: Font: 13 pt

4

18.23. Throughout Ms. Dunn's employment, APP failed to provide accurate and complete earning statements as required by Minn. Stat. § 181.032 and the contract itself.

19.24. Ms. Dunn regularly worked without pay on days when she was supposed to be relieved of duty for time off or to attend training.

20.25. During these times she answered questions from patients and coworkers, often to the extent that she was unable to complete training exercises.

21.26. Ms. Dunn made multiple requests for APP to provide her with Current Procedural Terminology ("CPT") codes and policies so that Ms. Dunn could bill patients properly.

22.27. APP refused to provide all relevant CPT codes and policies.

23.28. In JuneJuly 2021, Ms. Dunn reported to APP that patients may be improperly billed because she was unsure of what needed to be included in notes to meet billing requirements for billing the codes APP required her to use.

24.29. A short time after Ms. Dunn's report, APP summarily terminated Ms. Dunn's employment.

25.30. APP has refused—and continues to refuse—to provide calculations showing the basis for and calculations of her compensation.

26.31. APP has claimed to have "reason to believe" Ms. Dunn violated certain restrictive covenants but has failed to provide any evidence of those allegations.

27.32. Upon information and belief, Defendants did not keep records of hours Ms. Dunn worked.

28.33. APP paid Ms. Dunn less than the mandatory minimum wage for, at a minimum, the first and last monthsmonth of Ms. Dunn's employment.

Formatted: Font: 13 pt

29.34. APP has made vague legal threats to Ms. Dunn and the group with which she plans to provide care as an independent contractor.

30.35. Multiple patients have informed Ms. Dunn that they need prescription refills, but they are not able to get them because APP refuses to authorize refills unless those patients come in for an appointment that is not available until after they run out of medication.

31.36. APP has blamed Ms. Dunn for patient confusion although APP failed to comply with its contractual obligation to provide patients with a letter informing them of Ms. Dunn's departure, and for weeks after her departure her name, biography, and image were still on APP's website.

**Contractual Language**

32.37. The alleged restrictive covenants in the Employment Agreement are stated in several contradictory ways.

33.38. However, APP relies upon a provision without any geographic or practice scope limitations:

> Employee further agrees that, for a period of six months, measured from the date of Employee's separation from employment with Employer, Employee shall not, for any reason, without written consent by Employer, either personally or through or on behalf of another entity or individual, solicit or offer or provide service to any patient . . . .

Employment Agreement, p. 5, ¶ 9.

Formatted: Font: 13 pt
Formatted: Font: 13 pt

34.39. APP relies upon this provision in its cease and desist letter to Ms. Dunn.

35.40. Two other provisions purport to apply to Ms. Dunn if her employment is involuntarily terminated, but the provision APP seeks to enforce does not apply in that circumstance.

36.41. The contract provides as follows:

> Employee further understands that Employer shall write an official letter to patients informing them of the Employees [sic] separation from the group and that the Employee will have the opportunity to co-sign the letter.

Employment Agreement, p. 6, ¶ 10.

37.42. Not only did APP not comply with this provision, but its agents also attacked and blamed Ms. Dunn for the resulting patient confusion.

38.43. Instead of complying with the terms of the Employment Agreement, APP forced Ms. Dunn to expend many hours of unpaid work informing patients individually of her departure.

39.44. Ms. Dunn offered APP the opportunity to provide evidence that it complied with the Employment Agreement, and APP again declined.

40.45. APP appears to be concerned that Ms. Dunn has responded to patient inquiries regarding where she now plans to practice, but APP had declined to clarify what evidence it has of any conduct even potentially violative of the Employment Agreement.

41.46. Ms. Dunn invited APP to provide any legal authority that responding to patient inquiries could ever constitute improper competition or solicitation, even assuming an enforceable noncompete, and APP has not provided any.

Formatted: Font: 13 pt
Formatted: Font: 13 pt

**Personnel Records**

42.47. Ms. Dunn has demanded a copy of her personnel records in accordance with Minnesota law.

43.48. To date, Ms. Dunn's personnel records have not been provided to her.

**Demand for Payment of Wages**

44.49. Ms. Dunn has demanded in writing payment of all earned unpaid wages.

45.50. To date, APP has refused to provide Ms. Dunn a calculation of her wages or any payment of those wages yet unpaid.

**Underpayment**

46.51. Even based upon APP's illegal proposed compensation model, APP underpaid Ms. Dunn.

47.52. For example, her commissions in the first quarter of 2021 appear to her to be significantly less than would be required, given her treatment of patients in the final quarter of 2020.

48.53. Despite Ms. Dunn's request, APP has not provided the financial records showing the computation of Ms. Dunn's compensation.

49.54. At a minimum, Ms. Dunn worked for the first two months of her employment with almost no compensation.

50.55. In addition, APP has not paid Ms. Dunn for the last month of her work.

51.56. Notably, this period of time included many hours of "transition" work that could not have been compensated by fee sharing even if APP had properly compensated her with fee sharing.

~~52.~~57.  The Employment Agreement indicates that Ms. Dunn would not be paid for much of her work performed over three full months because she did not give notice of her termination and APP had not yet been paid by patients or third-party payors:

> Employee shall continue to receive payments on receivables for ninety (90) days following the Employee's last date of employment on the following conditions: a) Employee has timely submitted the charge slips as described in paragraph #3 above; and b) Employee has given Employer ninety (90) days' notice. **Should the conditions of a through herein [sic] not be complied with, Employee acknowledges and agrees that she shall be paid only up to and including Employee's last day of employment, and only for prior billed and/or collected receipts as described in paragraph #3 above.** Employee agrees that any receivables still outstanding for services after last day of employment and past the 90-day period shall go towards Employer's recouping costs associated with advertising and hiring a new Employee.

Employment Agreement, p. 6, ¶ 10 (emphasis added).

~~53.~~58.  This provision conditions payment upon the application of "paragraph #3," which does not exist, and then only allows for payment of "billed and/or collected receipts[.]"

~~54.~~59. Because APP has not provided any additional compensation or documentation regarding Ms. Dunn's compensation, presumably it believes this provision overrides Minnesota law.

~~55.~~60.  While it has not said so expressly, APP apparently relies upon this provision for its refusal to compensate Ms. Dunn for work performed toward the end of her employment.

Formatted: Font: 13 pt

Formatted: Font: 13 pt

9

**Wrongful Termination/Whistleblower Violation/Violation of MHRA**

56.61. Ms. Dunn demanded information regarding her billing and wages and was only once provided any such information.

57.62. Ms. Dunn made this demand in January of 2021 and was provided with incomplete information.

58.63. APP refused to provide the information, claiming Ms. Dunn had already been provided with the information.

59.64. APP did not explain why, even if that were true, Ms. Dunn would not be allowed to review a second copy of the information she needed to accurately bill patients.

60.65. In early June 2021 the CEO of APP, Seth Franz, sent an email requesting to meet individually with the providers on a quarterly basis to better get to know the providers.

61.66. Ms. Dunn scheduled a meeting with him for July 9, 2021.

62.67. On July 1, 2021, Ms. Dunn had a pre-scheduled meeting with the clinical manager.

63.68. At that meeting, Ms. Dunn complained that she needed additional information regarding how to code her billing properly.

64.69. The clinical manager asked if Ms. Dunn was suggesting that the billing was fraudulent, and Ms. Dunn indicated she was not sure because she had not been provided with the requested information.

65.70. At that meeting, APP criticized Ms. Dunn's work for the first time, and, asked what APP could do to support her work.

10

71.   Ms. Dunn indicated that she, while she did not agree with the criticisms, she had been having difficulty concentrating and had .

*Formatted: Font: 13 pt*

72.   On July 7, 2021, Ms. Dunn disclosed in writing to her supervisor, Melanie Heu, that she had recently been diagnosedtested for ADHD because she was having symptoms of distraction, forgetfulness, making mistakes, etc.

*Formatted: Font: 13 pt*

73.   The same day, Ms. Heu acknowledged the message and discussed with attention deficit/hyperactivity disorderMs. Dunn her "symptoms."

*Formatted: Font: 13 pt*

66.74.   Ms. Heu did not tell Ms. Dunn that a decision had been made to terminate Ms. Dunn's employment.

*Formatted: Font: 13 pt*

67.75.   Ms. Dunn met with Mr. Franz on July 9, 2021 as scheduled.

68.76.   At that meeting, APP terminated Ms. Dunn's employment.

69.77.   APP engaged in no interactive process to address whether Ms. Dunn had a disability or how APP could accommodate her.

70.   Shortly thereafter, APP terminated Ms. Dunn's employment.

71.78.   APP then interfered with Ms. Dunn's right to treat any patients.

*Formatted: Font: 13 pt*

72.79.   As a result of Defendants' actions, Ms. Dunn has suffered severe mental anguish and distress.

**The Individual Parties**

80.   Seth Franz is, and at all relevant times was, APP's CEO. As APP's CEO, he served on the leadership group that purportedly decided to terminate Ms. Dunn and told Ms. Dunn she had been terminated.

*Formatted: Font: 13 pt*
*Formatted: Font: 13 pt*

11

81.   Mr. Franz also served, during at least some of the time that Ms. Dunn worked at APP, as APP's director of operations, human resources manager, and compliance officer. In these capacities, he calculated Ms. Dunn's wages, and arranged for her to be paid. He did that work in the interest of APP in relation to Ms. Dunn.

82.   Priyanka Rao is APP's owner and chief clinical officer. As APP's owner and chief clinical officer, she served on the leadership group that purportedly decided to terminate Ms. Dunn. She also had operational control over clinical activities such as the ones in which Ms. Dunn was engaged. She acted in the interest of APP in relation to Ms. Dunn.

73.83.  Upon information and belief, Defendants Does 1-3 5 were also employers of Ms. Dunn or were joint employers of Ms. Dunn.

74.84.  Upon information and belief, Defendants Does 6–10 are APP's owners, agents or otherwise liable for the acts and omissions alleged in this Complaint.

75.85.  Upon information and belief, Defendants Does 11–15 were also employers of Ms. Dunn or were joint employers of Ms. Dunn.

76.86.  Upon information and belief, Defendants Does 16–20 are APP's owners, agents or otherwise liable for the acts and omissions alleged in this Complaint.

## CLAIMS

**COUNT I**
**DECLARATORY RELIEF**
**Uniform Declaratory Judgments Act**
**Minn. Stat. § 555.01,** *et seq.*
**(Against Defendant APP)**

Formatted: Font: 13 pt
Formatted: Font: 13 pt
Formatted: Line spacing: single

77.87.  Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

78.88.  As described in detail above, a present and judiciable controversy has arisen between the parties with regard to the Employment Agreement.

79.89.  APP has contended that various alleged restrictive covenants are binding and enforceable and prevent Ms. Dunn from seeing any patients.

80.90.  Specifically, through its counsel, APP wrote to Ms. Dunn on August 11, 2021 contending that the Employment Agreement "provides that during your employment with APP and for six months thereafter you 'shall not, for any reason without written consent by [APP], either personally or through or on behalf of another entity or individual, solicit or offer or provide service to any patient . . . .'"

81.91.  APP's counsel further threatened "APP has authorized us to take any and all measures, including legal action, to protect it from further harm and to compensate it for any damages[]" and threatened "the imminent potential for litigation . . . ."

82.92.  The alleged restrictive covenants are not enforceable against Ms. Dunn for several reasons, including lack of consideration, failure of consideration, material breach, unclean hands, illegality, overbreadth, and ambiguity.

Formatted: Font: 13 pt
Formatted: Font: 13 pt

13

~~83.~~ 93. Nurse practitioners are not exempt employees for wage payment purposes unless they satisfy both the primary duties and the salary basis test.

~~84.~~ 94. Because an agreement to pay an employee solely on a revenue basis is illegal, any reciprocal obligations on the part of the employee are also illegal and unenforceable.

~~85.~~ 95. Ms. Dunn requests a declaration from this Court that the purported restrictive covenants are not enforceable.

**COUNT II**
**BREACH OF CONTRACT**
**(Against Defendant APP)**

~~86.~~ 96. Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

~~87.~~ 97. The Employment Agreement exists between Ms. Dunn and APP as enforceable against APP because, to the extent the Employment Agreement provides for greater rights or compensation than would otherwise be legally required, such standards are incorporated into the legal compensation to be paid by statute and such contractual provisions are severable from the illegal or unenforceable provisions of the Employment Agreement pursuant to ¶ 17 of the Employment Agreement.

~~88.~~ 98. The illegality of the compensation provision does not save an employer from paying the agreed-upon higher compensation if it is higher than would otherwise be provided by law.

~~89.~~ 99. APP's actions and omissions, as more fully described above, breached the Employment Agreement including, without limitation, failure to pay Ms. Dunn's wages at

14

the agreed upon rate and failure to properly advise patients of the end to Ms. Dunn's employment.

~~90.~~100.       All conditions precedent to APP's performance under the contact have been met.

~~91.~~101.       Ms. Dunn has suffered damages as a result of the breach of contract.

**COUNT III**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Defendant APP)**

~~92.~~102.       Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

~~93.~~103.       Each contract in the State of Minnesota includes an implied covenant to act in good faith and deal fairly with other parties to the contract.

~~94.~~104.       APP's actions, as more fully detailed above, breached its duty to perform under the contract addressed in Count II and to deal fairly with Ms. Dunn, including its refusal to notify patients of Ms. Dunn's departure, as required by the contract, then faulting her for the resulting patient confusion.

~~95.~~105.       Upon information and belief, APP intentionally miscalculated Ms. Dunn's compensation.

~~96.~~106.       APP failed—and continues to fail—to provide any support for its calculations of Ms. Dunn's compensation.

~~97.~~107.       Ms. Dunn has suffered damages as a result of those breaches, including earned but unpaid compensation.

**COUNT IV**
**VIOLATION OF MINNESOTA FAIR LABOR STANDARDS ACT**
**Minn. Stat. § ~~117~~177.21, *et seq.***
**(Against All Defendants)**

~~98.~~108.   Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

~~99.~~109.   Minnesota law requires that any employee not exempt under the Minnesota Fair Labor Standards Act ("MFLSA") or paid on a piece rate basis be compensated on an hourly wage basis and paid a premium for any hours in excess of 48 worked in a workweek based upon the employee's "regular rate of pay" which may or may not be the employee's direct hourly wage.

~~100.~~110.   APP ~~qualifies~~and, as ~~an employer~~individuals who acted in APP's interest in relation to Ms. Dunn, Mr. Franz and Dr. Rao, qualify as employers pursuant to Minnesota law, including Minn. Stat. § 177.23, subd. 6.

~~101.~~111.   Upon information and belief, Does ~~1~~3–5 and Does 11–15 are defined as "employers" pursuant to Minn. Stat. §177.23, subd. 6 and are also liable for any unpaid compensation.

~~102.~~112.   Defendants failed to compensate Ms. Dunn on an hourly wage basis with a premium for hours worked in excess of 48 in a workweek.

~~103.~~113.   Ms. Dunn has suffered damages as a result of Defendants' violations of the MFLSA.

~~104.~~114.   Ms. Dunn is entitled to recover her attorney fees and costs incurred in remedying APP's violations of the MFLSA.

16

**COUNT V**
**VIOLATION OF MINNESOTA PAYMENT OF WAGES ACT**
**Minn. Stat. § 181.13**
**(Against All Defendants)**

Formatted: Line spacing:  single

~~105.~~115.    Minn. Stat. § 181.13(a) provides, in relevant part, as follows:

> Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater.

~~106.~~116.    Minn. Stat. § 181.13(a) further provides as follows:

> When any employer employing labor within this state discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee. Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater.

~~107.~~117.    The agreement pleaded in Count II constitutes a contract, and Ms. Dunn is entitled to the highest promised compensation.

~~108.~~118.    APP has failed to pay Ms. Dunn all of her earned wages despite receiving a written demand.

~~109.~~119.    Ms. Dunn has suffered damages as a result of APP's violation of the statute.

~~110.~~120.    Minn. Stat. § 181.171 authorizes a civil action for a violation of Minn. Stat. § 181.13.

Formatted: Font: 13 pt
Formatted: Font: 13 pt

~~111.~~ 121.      Ms. Dunn is entitled to recover her earned, unpaid wages as well as a

penalty consisting of an amount equal to 15 days of her average daily earnings.

~~112.~~ 122.      Ms. Dunn is entitled to an award of attorney fees and costs with regard

to the demand and recovery of unpaid wages.

**COUNT VI**
**VIOLATION OF THE MINNESOTA WAGE THEFT PREVENTION ACT**
**Minn. Stat. §§ 177.30, 181.032, 181.101**
**(Against ~~Defendant APP~~All Defendants)**

~~113.~~ 123.      The Minnesota Wage Theft Prevention Act was enacted to prevent

exactly the type of conduct APP has engaged in. Specifically, Minnesota law requires that

new employees receive detailed wage disclosure information, including information

regarding wage payment, to be disclosed at the beginning of the employment relationship

to help avoid wage and hour violations:

> (d) **At the start of employment**, an employer shall provide each employee a written notice containing the following information:
>
> > (1) **the rate or rates of pay and basis thereof, including whether the employee is paid by the hour, shift, day, week, salary, piece, commission, or other method, and the specific application of any additional rates**;
> > (2) allowances, if any, claimed pursuant to permitted meals and lodging;
> > (3) paid vacation, sick time, or other paid time-off accruals and terms of use;
> > (4) **the employee's employment status and whether the employee is exempt from minimum wage, overtime, and other provisions of chapter 177, and on what basis**;
> > (5) **a list of deductions that may be made from the employee's pay**;

(6) the number of days in the pay period, the regularly scheduled pay day, and the pay day on which the employee will receive the first payment of wages earned;

(7) the legal name of the employer and the operating name of the employer if different from the legal name;

(8) the physical address of the employer's main office or principal place of business, and a mailing address if different; and

(9) the telephone number of the employer.

(e) **The employer must keep a copy of the notice under paragraph (d) signed by each employee acknowledging receipt of the notice**. The notice must be provided to each employee in English. The English version of the notice must include text provided by the commissioner that informs employees that they may request, by indicating on the form, the notice be provided in a particular language. If requested, the employer shall provide the notice in the language requested by the employee. The commissioner shall make available to employers the text to be included in the English version of the notice required by this section and assist employers with translation of the notice in the languages requested by their employees.

(f) An employer must provide the employee any written changes to the information contained in the notice under paragraph (d) prior to the date the changes take effect.

Minn. Stat. § 181.032(d)–(f) (emphasis added).

~~114.~~124.      APP never provided the required notice.

~~115.~~125.      Ms. Dunn requested that APP provide a copy of the notice signed by

Ms. Dunn, and APP has not done so.

~~116.~~126.      APP also violated Minnesota law with respect to providing Ms. Dunn

earning statements. Specifically, the following is required:

Formatted: Font: 13 pt

Formatted: Font: 13 pt

(a) At the end of each pay period, the employer shall provide each employee an earnings statement, either in writing or by electronic means, covering that pay period. An employer who chooses to provide an earnings statement by electronic means must provide employee access to an employer-owned computer during an employee's regular working hours to review and print earnings statements.

(b) The earnings statement may be in any form determined by the employer but must include:

(1) the name of the employee;

(2) **the rate or rates of pay and basis thereof, including whether the employee is paid by hour, shift, day, week, salary, piece, commission, or other method**;

(3) allowances, if any, claimed pursuant to permitted meals and lodging;

(4) **the total number of hours worked by the employee unless exempt from chapter 177**;

(5) the total amount of gross pay earned by the employee during that period;

(6) **a list of deductions made from the employee's pay**;

(7) the net amount of pay after all deductions are made;

(8) the date on which the pay period ends;

(9) the legal name of the employer and the operating name of the employer if different from the legal name;

(10)     the physical address of the employer's main office or principal place of business, and a mailing address if different; and

(11)     the telephone number of the employer.

Minn. Stat. § 181.032(a) (emphasis added).

**Formatted:** Font: 13 pt

**Formatted:** Font: 13 pt

117.127.     Ms. Dunn's earning statements do not comply with the law, failing at least in the areas noted above in boldface text.

118.128.     The Employment Agreement provides that APP will deduct from pay a portion of its MinnesotaCare Provider Tax from Ms. Dunn's wages.

119.129.     Ms. Dunn's earning statements do not indicate any deductions for that purpose, which means that deductions were taken without proper notice.

120.130.     Minnesota law further required APP to keep detailed records of Ms. Dunn's compensation:

> (a)     Every employer subject to sections 177.21 to 177.44 must make and keep a record of: (1) the name, address, and occupation of each employee; (2) the rate of pay, and the amount paid each pay period to each employee; (3) the hours worked each day and each workweek by the employee, including for all employees paid at piece rate, the number of pieces completed at each piece rate; (4) a list of the personnel policies provided to the employee, including the date the policies were given to the employee and a brief description of the policies; (5) a copy of the notice provided to each employee as required by section 181.032, paragraph (d), including any written changes to the notice under section 181.032, paragraph (f);

Minn. Stat. § 177.30.

121.131.     Upon information and belief, APP did not keep such records.

122.132.     APP has refused to provide Ms. Dunn with any such records.

123.133.     The Minnesota Wage Theft Prevention Act provides as follows:

> (a) Except as provided in paragraph (b), every employer must pay all wages, including salary, earnings, and gratuities earned by an employee at least once every 31 days and all commissions earned by an employee at least once every three months, on a regular payday designated in advance by the

Formatted: Font: 13 pt

Formatted: Font: 13 pt

21

employer regardless of whether the employee requests payment at longer intervals. Unless paid earlier, the wages earned during the first half of the first 31-day pay period become due on the first regular payday following the first day of work. If wages or commissions earned are not paid, the commissioner of labor and industry or the commissioner's representative may serve a demand for payment on behalf of an employee. In addition to other remedies under section 177.27, if payment of wages is not made within ten days of service of the demand, the commissioner may charge and collect the wages earned at the employee's rate or rates of pay or at the rate or rates required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater, and a penalty in the amount of the employee's average daily earnings at the same rate or rates for each day beyond the ten-day limit following the demand. If payment of commissions is not made within ten days of service of the demand, the commissioner may charge and collect the commissions earned and a penalty equal to 1/15 of the commissions earned but unpaid for each day beyond the ten-day limit. Money collected by the commissioner must be paid to the employee concerned. This section does not prevent an employee from prosecuting a claim for wages. . . . For purposes of this section, wages are earned on the day an employee works. This section provides a substantive right for employees to the payment of wages, including salary, earnings, and gratuities, as well as commissions, in addition to the right to be paid at certain times.

Minn. Stat. § 181.101.

~~124.~~134.    APP failed to pay Ms. Dunn in accordance with this statute.

~~125.~~135.    Despite demand, APP has refused to pay Ms. Dunn pursuant to this statute.

Ms. Dunn is entitled to a penalty for this failure pursuant to Minn. Stat. § 181.101.

~~126.~~136.    Ms. Dunn is entitled to an award of attorney fees and costs with regard to the demand and recovery of unpaid wages.

22

**Formatted:** Font: 13 pt

**Formatted:** Font: 13 pt

127.137.    Upon information and belief, Does 1–3–5 and Does 11–15 are joint

employers of Ms. Dunn and are also liable for failing to properly pay Ms. Dunn

128.138.    Upon information and belief, Does 6–10 are owners of APP and are

also liable for APP's failure to pay Ms. Dunn properly.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

129.139.    Ms. Dunn incorporates the allegations contained in the preceding

paragraphs as if the same were fully set forth herein.

130.140.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

131.141.    Ms. Dunn performed labor for APP and to the benefit of all

Defendants, but Ms. Dunn has not been fully paid for her labor.

132.142.    All Defendants have been unjustly enriched through their interests in

APP's profits by retaining wages earned by Ms. Dunn.

133.143.    Injustice would result if Defendants were allowed to retain this

benefit.

134.144.    Accordingly, Defendants should be required to pay to Ms. Dunn the

wages she has earned.

**COUNT VIII**
**QUANTUM MERUIT**
**(Against All Defendants)**

135.145.    Ms. Dunn incorporates the allegations contained in the preceding

paragraphs as if the same were fully set forth herein.

136.146.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

23

137.147.     Ms. Dunn performed labor for APP and to the benefit of all Defendants, but Ms. Dunn has not been fully paid for her labor.

138.148.     The reasonable value of the labor Ms. Dunn provided greatly exceeded the compensation she received.

139.149.     As detailed more fully above, at times, Ms. Dunn received no payment for her labor.

140.150.     Ms. Dunn reasonably expected to be paid for the reasonable value of her labor.

141.151.     Injustice would result if Defendants are not required to compensate Ms. Dunn for the reasonable value of her labor.

142.152.     Accordingly, Defendants should be required to pay to Ms. Dunn the wages she has earned.

**COUNT IX**
**WRONGFUL TERMINATION/WHISTLEBLOWER VIOLATION**
**Minn. Stat. § 181.932**
**(Against ~~All Defendants~~Defendant APP)**

143.153.     Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

144.154.     The Minnesota Whistleblower Act provides:

> Prohibited action. An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the ~~employee's~~employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or

planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(2) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(3) the employee refuses an ~~employer's~~employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason;

(4) the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm;

. . .

Minn. Stat. § 181.932, subd. 1.

~~145.~~155.     Ms. Dunn made good faith reports that she believed she was given incomplete information regarding billing codes and demanded additional information.

~~146.~~156.     Ms. Dunn made expressed good faith concerns that her compensation was not being properly calculated.

~~147.~~157.     Shortly after Ms. Dunn's report, APP terminated Ms. Dunn's employment.

~~148.~~158.     APP's termination of Ms. Dunn's employment was motivated at least in part by her complaints of improper billing and failure to account for and pay her compensation.

~~149.~~159.     Ms. Dunn has suffered damages as a result of APP's retaliatory termination, including past and future lost wages and benefits and the costs of bringing this action.

**COUNT X**
**FAILURE TO PROVIDE PERSONNEL RECORDS**
**Minn. Stat. § 181.961**
**(Against Defendant APP)**

~~150.~~160.     Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

~~151.~~161.     Ms. Dunn demanded that APP provide her a copy of her personnel records.

~~152.~~162.     More than seven working days have elapsed since Ms. Dunn's request, and APP has provided no personnel records.

~~153.~~163.     Ms. Dunn incurred damages including attorney fees as a result of APP's refusal to provide copies of Ms. Dunn's personnel records.

**COUNT XI**
**VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT ("FLSA")**
**(Against All Defendants)**

~~154.~~164.     Ms. Dunn incorporates the allegations in the preceding paragraphs as if the same were fully set forth herein.

~~155.~~165.     The FLSA requires covered employers to pay non-exempt employees no less than one-and-one-half times their regular rate of pay for all hours worked in excess of forty hours in a workweek. 29 U.S.C. § 207.

Formatted: Font: 13 pt

Formatted: Font: 13 pt

Formatted: Font: 13 pt

Formatted: Font: 13 pt

166.    APP and, as individuals who acted in APP's interest in relation to Ms. Dunn, Mr. Franz and Dr. Rao, qualify as employers pursuant to 29 U.S.C. § 203(d).

156.167.    Defendants are an "enterprise" as defined by the FLSA, 29 U.S.C. § 203(r)(1), and are engaged in commerce within the meaning of the FLSA, § 203(b), (s)(1).

157.168.    Upon information and belief, Does 13–5 and Does 11–15 are joint employers of Ms. Dunn and are also liable for failing to properly pay Ms. Dunn

158.169.    Upon information and belief, Does 6–10 are owners of APP and are also liable for APP's failure to pay Ms. Dunn properly.

159.170.    Ms. Dunn is a non-exempt covered employee under 29 U.S.C. § 203(e)(1).

160.171.    Ms. Dunn has worked more than forty hours per week for Defendants during the applicable time period.

161.172.    Defendants have not properly compensated Ms. Dunn for their overtime hours as required by the FLSA.

162.173.    Defendants failed to make a good-faith effort to comply with the FLSA as it relates to the compensation of Ms. Dunn.

163.174.    Defendants knew Ms. Dunn worked overtime without proper compensation, and they willfully failed and refused to pay Ms. Dunn wages at the required overtime rates. *See* 29 U.S.C. § 255.

164.175.    Defendants' willful failure and refusal to pay Ms. Dunn overtime wages for time worked violates the FLSA. 29 U.S.C. § 207.

165.176.     Defendants failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions of employment, in violation of the FLSA, 29 U.S.C. § 255(a).

166.177.     Ms. Dunn has been damaged by Defendants' willful violations of the FLSA and has suffered a loss of income and other damages.

167.178.     Ms. Dunn is entitled to liquidated damages and attorney fees and costs incurred as a result of this claim.

**COUNT XII**
**FAILURE TO TIMELY PAY WAGES**
**Minn. Stat. § 181.101**
**(Defendant APP)**

168.179.     Ms. Dunn incorporates the allegations in the preceding paragraphs as if the same were fully set forth herein.

169.180.     During the course of Ms. Dunn's employment, Defendant APP regularly failed to pay Ms. Dunn within 31 days of the date the wages were owned.

170.181.     More than 10 days have passed since Ms. Dunn has demanded her earned but unpaid wages.

171.182.     Ms. Dunn has been damaged by Defendant's APP failure to timely pay her earned wages.

183.     Ms. Dunn is entitled to damages in the amount of her unpaid wages, as well as applicable statutory penalties for Defendant APP's failure to timely pay wages, as well as attorney fees and costs incurred as a result of this claim. COUNT XIII

**COUNT XIII**
**VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

28

**Minn. Stat. 363A.01, et seq.**
**(Against All Defendants)**

<del>172.</del>184.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

<del>173.</del>185.    Ms. Dunn was and is qualified to work in <del>his</del>her position with APP.

<del>174.</del>186.    Ms. Dunn informed APP that she had been recently <del>diagnosed with</del>tested for ADHD.

<del>175.</del>187.    APP regarded Ms. Dunn as a person with a disability.

<del>176.</del>188.    APP terminated Ms. Dunn at least in part as a result of its regarding her as a person with a disability.

<del>177.</del>189.    APP's proffered reasons for terminating Ms. Dunn's employment is not worthy of credence because, despite claiming to have documentation of its alleged bases, it did not provide those as part of Ms. Dunn's personnel records and may not rely upon them—if they exist—pursuant to Minn. Stat. § 181.963.

<del>178.</del>190.    Accordingly, Ms. Dunn has been damaged on the basis of the actions taken by APP to discriminate against her employment on the basis of disability.

<del>As a direct and proximate result of the violation, Ms. Dunn has sustained damages in excess of $50,000 as well as interest, costs, disbursements, and incidental and consequential losses.</del>

**COUNT XIV**
**PROMISSORY ESTOPPEL**
**(Against All Defendants)**

191.    Ms. Dunn incorporates the allegations contained in the preceding paragraphs as if the same were fully set forth herein.

29

192.    Ms. Dunn pleads this Count in the alternative to Counts II and III.

193.    APP made a clear and definite promise to pay Ms. Dunn on the basis set forth in the employment agreement.

194.    APP, as the promisor, intended to induce reliance, and Ms. Dunn, as the promise, in fact relied on the promise to her detriment.

195.    In the absence of an adequate remedy at law, the promise must be enforced to prevent injustice.

196.    Ms. Dunn has suffered damages as a result of APP's failure to fulfill its promise.

## **REQUEST FOR RELIEF**

Plaintiff, Sheila M. Dunn, requests that the Court:

1.    Enter judgment in her favor and against Defendants for each of the claims asserted in this Complaint;

2.    Order a speedy hearing on Plaintiff's claim for declaratory judgment in accordance with Minnesota Rule of Civil Procedure 57;

3.2.    Declare the noncompete/nonsolicit restrictive covenants contained in the Employment Agreement to be unenforceable;

4.3.    Enjoin Defendants and anyone acting on their behalf from attempting to enforce the noncompete/non-solicit restrictive covenants contained in the Employment Agreement or threatening Plaintiff or any third party with any enforcement action;

30

~~5.~~4.     Enter judgment in favor of Ms. Dunn and against APP, Mr. Franz, Dr. Rao, and Does ~~13~~20 jointly and severally in an amount greater than $50,000, to include compensatory damages, to include front and back pay;

~~6.~~5.     Award Ms. Dunn liquidated damages for unpaid wages;

~~7.~~6.     Award Ms. Dunn the full statutory penalties for failure to timely pay wages;

~~8.~~7.     Award Ms. Dunn her legal expenses, including attorney fees, costs, and disbursements; and

~~9.~~8.     Award all other relief the court deems just and equitable.


Dated: ~~March 4,~~_____, 2022          **GODWIN DOLD**

                                   */s/ James A. Godwin*
                                   James A. Godwin, #392020
                                   Rick A. Dold, #394847
                                   ~~Chris K. White, #396840~~
                                   300 1st Ave. NW, Suite 306
                                   Rochester, MN  55901
                                   Telephone: 507-218-8383
                                   james@godwindold.com
                                   rick@godwindold.com
                                   ~~chris@godwindold.com~~

                                   **ATTORNEYS FOR PLAINTIFF**

**ACKNOWLEDGEMENT**

~~The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, subd. 1, to the party or parties against whom the allegations in this pleading are asserted.~~

                                   ~~/s/ James A. Godwin~~
                                   ~~James A. Godwin, #392020~~

31